**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Gabriel GABRIEL and Badie Abdulahad, Defendants-Appellants.**

**No. 86–1289, 86–1290.**

United States Court of Appeals, Seventh Circuit.

Argued Sept. 15, 1986.

Decided Jan. 15, 1987.

Elliot M. Samuels, Chicago, Ill., for defendants-appellants.

James M. Conway, Asst. U.S. Atty., Anton R. Valukas, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before WOOD, Jr., COFFEY, and RIPPLE, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

Defendants-appellants Gabriel Gabriel and Badie Abdulahad were tried jointly before a jury on charges of attempted arson, conspiracy, and solicitation. Both defendants were convicted of conspiring to commit arson and to solicit another to commit arson, in violation of 18 U.S.C. § 371, and of solicitation of another to commit arson, in violation of 18 U.S.C. § 373. In addition, Gabriel Gabriel was convicted of attempted arson, in violation of 18 U.S.C. § 844(i), and of aiding and abetting solicitation, in violation of 18 U.S.C. §§ 2 and 373.[1] Defend-

---

1. Gabriel was fined $1,000, and was sentenced to 18 months imprisonment and five years of probation following his prison term. Abdulahad was sentenced to one year of imprisonment

ants appeal their convictions, alleging that the evidence of their intent to conspire regarding, solicit, and attempt arson is insufficient to support those convictions. Badie Abdulahad further alleges that the evidence was insufficient to establish that he was not entrapped with respect to the offenses charged. We find sufficient evidence of intent and that Abdulahad is precluded from asserting the defense of entrapment. We therefore sustain the convictions of both defendants.

## I. FACTUAL BACKGROUND

Since the sufficiency of the evidence is questioned by the defendants in various respects, we review the facts in more than usual detail. In June 1985, Daniel Callahan, Special Agent with the Illinois Department of State Police, gave an undercover phone number to a confidential informant and asked to have it circulated to a person named Gabriel. The informant had told Callahan that "Gabriel" was looking for someone to burn his store. Callahan also asked the informant to circulate information that the number could be that of an arsonist available for hire.

Callahan received a phone call on this line on June 27, 1985, from a person named "Gabe," who indicated that he understood Callahan might be able to do something for him regarding his store. When asked by Callahan if that meant burning his store, Gabe replied "yes." Gabe also asked for more insurance coverage for his store. Gabe gave his phone number, which was traced by Callahan to Gabriel's Groceries in Chicago, Illinois.

Callahan contacted the federal Bureau of Alcohol, Tobacco and Firearms (ATF) for assistance in the investigation. Callahan was assigned the role of arsonist "Dan Kelly." ATF Agent Art Chavarria was to work with Callahan, a.k.a. Kelly, during the investigation and was to play the part of insurance broker "Art Martinez." At this time the agents agreed that they would electronically record all future meetings and phone calls with the subjects of

the investigation. The following discussion of the facts of this case is gleaned for the most part from transcripts of recorded conversations.

On July 1, 1985, Callahan called Gabriel to inform him that Callahan had found someone to provide him with insurance. Gabriel set an appointment for the following morning to meet with Callahan and the insurance agent. In this meeting at Gabriel's Groceries, Callahan, Chavarria and Gabriel discussed insurance coverage and the finances of the store. Gabriel told them that the insurance policy for his small neighborhood grocery had been cancelled. While Chavarria was surveying the layout of the store, Gabriel asked Callahan if he, Callahan, could be trusted and whether Chavarria knew "everything." Gabriel asked if Callahan was going to "do it" through "electric" and expressed a concern that "fire department detectives could account for gasoline." Gabriel noted that there were all singles in the apartments above his grocery and suggested they could "blow [sic] whole building." He then withdrew this suggestion. Gabriel asked how long it would be until he received the insurance money. Callahan guessed that it would be about three weeks. Gabriel said that after he got the money he would go somewhere, possibly to Texas or California.

Callahan and Gabriel also discussed payment. Callahan asked Gabriel for "something ahead of time." Gabriel responded: "When I get the money. I'm broke, you see, that's why I'm gonna do this." Callahan asked for twenty percent of the insurance proceeds; Gabriel said thirteen percent. Callahan responded with a figure of fifteen percent, and Gabriel replied that he could give Callahan another business, a restaurant on Clark Street. Gabriel suggested that Callahan should call his friend Badie at this business and say that Gabriel asked him to call. Gabriel wrote down the phone number, which Callahan later checked and found was listed to the Family Golden Chicken Restaurant.

followed by five years of probation and was fined $500.

On July 3, 1985, Callahan called Gabriel to inquire about contacting Badie. Gabriel suggested Callahan call Badie and tell him that Gabriel said to call him, and then call Gabriel back. Callahan then called Badie, who acknowledged that he had talked with Gabriel. Badie asked Callahan to come to his restaurant that afternoon. Callahan called Gabriel to tell him he had contacted Badie and would meet with him, and that Badie wanted Gabriel to call him.

That afternoon, Callahan went to Badie Abdulahad's Family Golden Chicken Restaurant. Abdulahad said that he had talked with Gabriel and told Callahan that his insurance would expire August 1, 1985. Callahan asked Abdulahad if he wanted "it" done before August 1, and Abdulahad expressed concern that the insurance company would know that he did it on purpose. Abdulahad suggested that Callahan start the fire through "electric," and said that he did not care how or where the fire started in the building because "nobody lives upstairs." He also said that he did not want to hurt anyone.

Callahan asked to be paid up front. Abdulahad replied that he had nothing to give him. Callahan asked for twenty percent of the insurance proceeds; Abdulahad said that was too much, and asked if this would include costs such as obtaining a lawyer to get the money after the fire. Abdulahad asked if he should change his insurance or get a new insurance policy, but Callahan assured him that it was not necessary because his policy had not terminated as Gabriel's had. Abdulahad agreed that he should keep the same insurance.

Callahan told Abdulahad that the insurance company would not give them any trouble on collecting the claim if the fire looked like an accident. Abdulahad offered to leave Chicago or stage a car accident with his wife and be in the hospital at the time of the fire. Callahan told Abdulahad that this plan was too complicated, but that it was up to Abdulahad as to what he wanted to do—whether to go on a trip or leave Chicago.

Callahan and Abdulahad also discussed the logistics of starting the fire. Abdulahad expressed misgivings about using gasoline because he believed the smell to be easily detectable, asked Callahan to come back the following day for "the right idea about the right way" to start the fire, agreed with Callahan that the kitchen would be a better location for the fire than the restaurant proper, and was concerned that there be enough damage to receive insurance proceeds. Callahan arranged to meet with Abdulahad again at his restaurant the following Friday. Abdulahad stated that if Callahan had to contact him in the meantime, he should call Gabriel.

The next Friday, July 5, Callahan met Abdulahad at the restaurant. Abdulahad was concerned that he would have problems recovering from the insurance company. Callahan responded by telling him that the guy (Chavarria) handling Gabriel's insurance would also help work out any problems with the insurance company. Abdulahad was also concerned that the police might catch Callahan and that the fire might fizzle out. Callahan repeatedly asked whether Abdulahad wanted him to set the fire, and Abdulahad reiterated that he did and that he would not back out. The two again discussed Callahan's percentage. Abdulahad said that Gabriel had told him Callahan would be getting thirteen percent from Gabriel. Abdulahad said Callahan should get thirteen percent from him as well, stating "[m]ine and [Gabriel's business] same."

On July 8, 1985, Chavarria went to Gabriel's Groceries and gave Gabriel a phony $95,000 insurance policy, for which Gabriel paid a $325 premium. Chavarria had earlier told Gabriel that when Gabriel paid the premium, the insurance would take effect and he would call Callahan. Chavarria told Gabriel to make sure the business records were out of the store before the fire. Gabriel asked who would be expecting or getting the thirteen percent after the fire, and Chavarria said that the fee was between Callahan and Gabriel, but that Callahan would take care of him.

That evening, Callahan met with Gabriel at Gabriel's Groceries. Callahan asked if he could set both fires the following Wednesday night. Gabriel wanted the fires to be put off, however, so he could ensure that his records reflected current receipts. Gabriel was worried that the insurance company would not believe that his business was worth $90,000. Gabriel said he did not want to be in trouble. The two discussed specifics of how the fire would be set. Gabriel was concerned about people seeing the fire being set. Callahan repeatedly asked for a spare key to the grocery, but Gabriel refused and told Callahan he would leave the door open. Gabriel expressed a concern that he would be in trouble if Callahan were caught with a key. Gabriel suggested that it would be better to have Callahan just break a window and pour gasoline into the store than to give Callahan a key. Callahan again asked to set the fire Wednesday. Gabriel resisted at first, saying that any day the next week would be better, but he finally agreed to that date.

At Callahan's insistence, Gabriel called Abdulahad to tell him that the date for the fires had been set for Wednesday. Abdulahad said it was not a good date for him because some band equipment belonging to a friend was being stored in the basement and it would not be picked up until Saturday. Callahan tried to placate Abdulahad, telling Gabriel to tell Abdulahad that this did not matter because the insurance would cover the band equipment as well. Abdulahad still resisted, and Callahan arranged to see Abdulahad immediately at Abdulahad's restaurant to discuss the dates for the fires.

Several minutes after Callahan and Abdulahad began their meeting at the restaurant, Gabriel joined the conversation. Abdulahad said that Saturday would be fine with him because the band equipment would be out of his basement. Callahan still pushed for the Wednesday date, and Abdulahad responded: "I don't mind it next week. Monday, Tuesday, Wednesday are better." Customers came within hearing distance of the three, and they agreed to go to the Gold Nugget restaurant for further discussion.

At the Gold Nugget restaurant, the three agreed that the fires would be set the following Saturday, July 13. Callahan told them that they should give him keys for their businesses, and that he would leave the keys in the stores after starting the fires. The three discussed where to meet the next Saturday to transfer the keys. They finally agreed to meet at the Gold Nugget at 8:00 p.m.

On Saturday at 8:00 p.m., Callahan went to the Gold Nugget restaurant. Neither Gabriel nor Abdulahad were there. Callahan then went to Gabriel's Groceries to see Gabriel. Gabriel told Callahan that Abdulahad had changed his mind and that Abdulahad did not want to "do it." Gabriel also told Callahan that Abdulahad thought Callahan's interest was too much, and that Abdulahad wanted new insurance before having his restaurant burned. Gabriel said he was scared and refused to give Callahan a key. He asked if Callahan could just throw gasoline under the front door. After the conversation, Gabriel was arrested. At the time of his arrest he had with him a red binder which contained business records from the store, including his receipt for the phony insurance policy. Gabriel testified that this binder contained only current records, and that his permanent records were still in his grocery.

Callahan then met with Abdulahad outside his restaurant. Abdulahad refused to give Callahan a key. He told Callahan that he wanted more insurance coverage for the restaurant and agreed to pay Callahan thirteen percent. Abdulahad said that he did not want Callahan burning the restaurant until one month after obtaining the new insurance policy. Callahan repeatedly asked whether Abdulahad was sure that he wanted the restaurant burned, and Abdulahad responded that he did as long as there were no keys involved, and that he would not change his mind. Abdulahad was then arrested.

The defense presented testimony that Gabriel and Abdulahad were from Iraq, Gabriel having come to the United States in 1978, and Abdulahad in 1982. They had both been looking for other insurance policies for their businesses before they met Callahan. Gabriel's policy had been cancelled; Abdulahad's policy was to be cancelled August 1, 1985. Abdulahad had an insurance broker looking for insurance for him, and that broker had told him it would be difficult to get insurance and encouraged him to look elsewhere. Gabriel and Abdulahad had agreed to share information about possible sources of insurance.

Gabriel testified that he had called Callahan originally because a friend had given him the number, saying Callahan was an insurance agent. Gabriel said that when Callahan told him that he could get insurance on one condition—that he burn down his store—he laughed and said that he would think about it.

Abdulahad attested that when Gabriel called to tell him that he knew someone who sold insurance to businesses seeking recovery from arson losses, the two agreed that they would "play along" with Callahan just to get insurance. Gabriel claimed that during the course of his contacts with Callahan he became scared of him, tried to push him away, and was afraid that if he did not go along with Callahan, he would be killed. He testified that he did not give Callahan a key to his business, because he was afraid that if he did, Callahan could do whatever he wanted. Gabriel denied ever discussing a plan to burn down his store and Abdulahad's restaurant. If Callahan insisted that he burn his store, Gabriel planned to "give him couple hundred [dollars]." Gabriel testified that he told the same thing to Abdulahad—that if Callahan pushed, Abdulahad should just give him some money. Abdulahad attested that Gabriel had told him to humor Callahan.

Abdulahad also testified that he was afraid of Callahan, and that he was not interested in burning his restaurant. Because he just wanted to get insurance, he stated, he tried to make it very difficult for Callahan to start the fire. Abdulahad asserted that he did this by telling Callahan it was impossible to get through the back door, by refusing to give Callahan a key, by constantly delaying the date set for the fires, by lying about the band equipment in the basement of his restaurant, and by telling Callahan in their last meeting that he wanted the fire done in a month after getting another insurance policy. Abdulahad attested that he thought Callahan was a "bad guy" and he wanted to "get rid of" Callahan.

## II. SUFFICIENCY OF THE EVIDENCE

Appellants Gabriel and Abdulahad allege that there is insufficient evidence of their criminal intent to sustain their convictions for conspiracy, solicitation, aiding and abetting solicitation, and attempted arson. It is well-settled that in a challenge based on sufficiency of the evidence, we will affirm the conviction if "after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *United States v. Andrus*, 775 F.2d 825, 853 (7th Cir.1985) (quoting same).

The question then is whether the evidence, taking all inferences in the government's favor, could persuade any rational person of the defendants' intent to conspire regarding, solicit, and attempt arson. The evidence in the instant case meets that standard for both defendants regarding each offense. We will consider in turn intent standards and sufficiency of the evidence for each offense.

### A. *Conspiracy*

Gabriel and Abdulahad argue that the government has failed to prove beyond a reasonable doubt that they had the intent to conspire to commit or to solicit arson. The intent necessary to support a conviction for conspiracy is that the defendant intend "to join and associate himself with

[the] criminal design and purpose" of the conspiracy. *United States v. Herrera*, 757 F.2d 144, 149 (7th Cir.1985); *see United States v. Perry*, 747 F.2d 1165, 1169 (7th Cir.1984); *see also United States v. Anderson*, 542 F.2d 428 (7th Cir.1976) (conviction of conspiracy requires an intent to participate in the unlawful enterprise). As the Supreme Court has noted, this intent is "more than knowledge, acquiescence, carelessness, indifference, lack of concern," but rather is "informed and interested cooperation, stimulation, instigation." *Direct Sales Co. v. United States*, 319 U.S. 703, 713, 63 S.Ct. 1265, 1270, 87 L.Ed. 1674 (1943). In addition, a " 'stake in the venture' which, even if it may not be essential, is not irrelevant to the question of conspiracy." *Id.* (footnote omitted).

■ The evidence is ample to show that the defendants engaged in informed and interested cooperation, and indeed, had a "stake in the venture." Gabriel helped to instigate the arson by introducing Abdulahad to Callahan and by suggesting the possibility that Abdulahad would be interested in burning his restaurant. Gabriel's interest in fostering this relationship was that he thought Callahan might be willing to accept a lower payment for the arson of Gabriel's store in return for information on Abdulahad.

Gabriel and Abdulahad argue that they associated with Callahan to obtain insurance, and not insurance proceeds from an arson. They testified that they planned to rebuff Callahan as soon as they obtained the insurance. The jury could have determined from the evidence, however, that both Gabriel's and Abdulahad's "stake in the venture" of associating with Callahan was to obtain insurance *proceeds* after the planned arsons, and not insurance alone. Abdulahad spoke with Gabriel before meeting Callahan, and knew from his talk with Gabriel that a condition of obtaining insurance from Callahan was that his business would be burned. Both Abdulahad and Gabriel were "cooperating" in the enterprise, hiring Callahan on the same terms, thirteen percent of the insurance proceeds with no money down. Abdulahad had stressed that Callahan should accept the same percentage from both him and Gabriel. Gabriel and Abdulahad met with Callahan to discuss the specifics of how the arsons would be carried out, including how the keys to their businesses would be turned over to Callahan and when the arsons would take place.

■ Both defendants contend that they did not actually cooperate with Callahan, noting that they made excuses at various times and tried in other ways to postpone the date of the arsons, and that immediately before their arrests they were trying to "get rid of" Callahan. The jury could have determined, however, that this did not indicate lack of intent to cooperate in carrying out the arson, but rather displayed their fear of being connected with the planned arsons if Callahan were caught. We find, after considering the record and taking all inferences in the government's favor, that there is sufficient evidence of Gabriel's and Abdulahad's criminal intent to sustain their convictions of conspiracy.

### B. *Solicitation*

■ Gabriel and Abdulahad further argue that government did not establish their intent to solicit the crime of arson. Again, we find that the evidence of intent is sufficient to support their convictions for solicitation. The solicitation statute, 18 U.S.C. § 373 (Supp. III 1985),[2] specifically provides that a defendant have intent to solicit the prohibited crime.[3] As stated in

---

**2.** Before the passage of this solicitation statute in 1984, Comprehensive Crime Control Act of 1984, Pub.L. No. 98–473, § 1003(a), 98 Stat. 1976, 2138, there was no federal law prohibiting solicitation generally. *See* S.Rep. No. 225, 98th Cong., 2d Sess. 308, *reprinted in* 1984 U.S. Code Cong. & Admin.News 3182, 3487. To this date, the solicitation statute has not been interpreted by federal appellate courts.

**3.** Section 373 provides in pertinent part:

(a) Whoever, with intent that another person engage in conduct constituting a felony that has as an element the use, attempted use, or threatened use of physical force against the

the Senate Report accompanying the legislation of which this statute was a part, the surrounding circumstances in general must indicate that the solicitor is serious that the person solicited actually carry out the crime. S.Rep. No. 225, 98th Cong., 2d Sess. 308, *reprinted in* 1984 U.S.Code Cong. & Admin.News 3182, 3488. Congress has provided examples of "strongly corroborative circumstances" that are highly probative of intent:

(i) the fact that the defendant offered or promised payment or some other benefit to the person solicited if he would commit the offense;

(ii) the fact that the defendant threatened harm or some other detriment to the person solicited if he would not commit the offense;

(iii) the fact that the defendant repeatedly solicited the commission of the offense, held forth at length in soliciting the commission of the offense, or made express protestations of seriousness in soliciting the commission of the offense;

(iv) the fact that the defendant believed or was aware that the person solicited had previously committed similar offenses;

(v) the fact that the defendant acquired weapons, tools or information suited for use by the person solicited in the commission of the offense, or made other apparent preparations for the commission of the offense by the person solicited.

S.Rep. No. 307, 97th Cong., 1st Sess. 183 (1982) (footnotes omitted).[4] The above

factors are not exclusive or conclusive indicators of intent to solicit.[5] They do, however, provide guidance on the question of intent.

Several of the "corroborative circumstances" are present here. Gabriel and Abdulahad separately agreed to pay Callahan thirteen percent of the insurance proceeds as payment for committing the arsons. Both Gabriel and Abdulahad had extended conversations with Callahan regarding payment, the means by which the arsons would be committed, and the time at which the arsons would take place. In addition, when pressed by Callahan, both defendants expressed that they were serious about the arson and would not "back out." Callahan told Gabriel and Abdulahad, and they likely believed, that Callahan had committed arsons before. The defendants testified that they were scared of Callahan and that they believed he might have friends that could hurt them.

Gabriel and Abdulahad argue that the evidence indicates that they were not serious about soliciting Callahan to commit the arsons and refused to aid Callahan in preparing for the arsons. They point to their efforts to postpone and delay the date set for the arsons, including their refusal to give Callahan keys to their businesses, and, in Gabriel's case, a refusal to buy rubbing alcohol for the fire as Callahan had suggested. Callahan could have supposed, and the jury could have inferred, however, that the efforts by the defendants to delay and their refusal to provide aid to Callahan

person or property of another in violation of the laws of the United States, and under circumstances strongly corroborative of that intent, solicits, commands, induces, or otherwise endeavors to persuade such other person to engage in such conduct, shall be imprisoned not more than one-half the maximum term of imprisonment or fined not more than one-half of the maximum fine prescribed for the punishment of the crime solicited, or both; or if the crime solicited is punishable by death, shall be imprisoned for not more than twenty years.

4. The discussion of the elements of solicitation found in this report on S. 1630, a bill that contained a precursor to § 373, was adopted by

the Senate Judiciary Committee in its later report accompanying § 373. *See* S.Rep. No. 225, 98th Cong., 2d Sess. 308 & n. 4, *reprinted in* 1984 U.S.Code Cong. & Admin.News 3182, 3487–88 & n. 4. The earlier solicitation proposal, § 1003, differed in that it would have applied to a broader range of offenses, and not just the crimes of violence covered in the later § 373. *Id.* at 308, *reprinted in* 1984 U.S.Code Cong. & Admin.News at 3487.

5. The Senate Committee that considered a precursor to § 373, *see supra* note 4, emphasized that "the existence of strongly corroborating circumstances [is] a question of fact for the jury." S.Rep. No. 307, 97th Cong., 1st Sess. 183 (1982).

were means of distancing themselves from the planned arsons and not designed to rebuff or discourage Callahan.

Taking into consideration the strongly corroborating circumstances of defendants' intent to solicit Callahan, as well as the maxim that we must take all inferences in favor of the government, we find that there is ample evidence to persuade a rational jury beyond a reasonable doubt of the defendants' intent to solicit and therefore sustain their convictions under the solicitation statute.

### C. *Attempted Arson and Aiding and Abetting Solicitation*

■ Gabriel alone was convicted of attempted arson and aiding and abetting Abdulahad's solicitation of Callahan. He argues that there is insufficient evidence of his intent to sustain those convictions. The requisite mental state for aiding and abetting is that the defendant intentionally encourage or assist another in the commission of an offense. *United States v. Greer*, 467 F.2d 1064, 1069 (7th Cir.1972), *cert. denied*, 410 U.S. 929, 93 S.Ct. 1364, 35 L.Ed.2d 590 (1973). The government must prove that the defendant " 'in some sort associate[d] himself with the venture,' " *id.* at 1068–69 (quoting Judge Learned Hand in *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir.1938)), such that the defendant "shared the criminal intent of the principal." *United States v. Pope*, 739 F.2d 289, 291 (7th Cir.1984). Proof of this criminal intent may be inferred from the surrounding circumstances. *Id.* at 291–92; *United States v. Beck*, 615 F.2d 441, 449 (7th Cir. 1980); *Greer*, 467 F.2d at 1069.

■ Gabriel contends that he did not intend to assist Abdulahad in soliciting Callahan to commit arson. The evidence, however, indicates that Gabriel gave Callahan Abdulahad's telephone number, called Abdulahad (at the insistence of Callahan) to set up a meeting between Abdulahad and Callahan, informed Abdulahad that Callahan was an arsonist, acted as a go-between for Callahan and Abdulahad (Abdulahad once told Callahan that if he needed to

contact Abdulahad, he should just call Gabriel), and participated in a meeting with Abdulahad and Callahan during which the three discussed how to commit the arsons and when the arsons should take place. It is very likely that if it were not for Gabriel's involvement, Abdulahad would never have known of Callahan or believed that he could trust Callahan. Gabriel argues that he was only intending to assist Abdulahad in soliciting Callahan for insurance and not for arson; however, the jury could have inferred that because the two defendants knew Callahan was an arsonist and because the defendants discussed arson with Callahan, Gabriel intended to assist Abdulahad in soliciting Callahan to commit arson. Thus there is evidence sufficient to persuade a rational person beyond a reasonable doubt of Gabriel's intent to aid and abet Abdulahad's solicitation to sustain Gabriel's conviction on that ground.

■ Gabriel further contends that there is insufficient evidence of his intent to sustain his conviction of attempted arson. The intent standard for attempt is that expressed in *United States v. Mandujano*, 499 F.2d 370, 376 (5th Cir.1974), *cert. denied*, 419 U.S. 1114, 95 S.Ct. 792, 42 L.Ed.2d 812 (1975): "the defendant must have been acting with the kind of culpability otherwise required for the commission of the crime which he is charged with attempting." *See United States v. Rovetuso*, 768 F.2d 809, 821 (7th Cir.1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 838, 88 L.Ed.2d 809 (1986); *United States v. Green*, 511 F.2d 1062, 1072 (7th Cir.), *cert. denied*, 423 U.S. 1031, 96 S.Ct. 561, 46 L.Ed.2d 404 (1975). Thus there must have been sufficient evidence of Gabriel's intent to commit arson to sustain his conviction for attempted arson.

■ We find such evidence in the record. Gabriel participated along with Abdulahad in a meeting with Callahan during which the three agreed on a date for the arsons and discussed the logistics of transferring keys for Gabriel's and Abdulahad's businesses to Callahan. During his last encounter with Callahan, Gabriel re-

fused to give Callahan a key; however, he told Callahan to just dump gasoline under the door. The government argues persuasively that at this point, there was not much more that Gabriel could have done considering his role in the planned arson. He had shown Callahan the layout of his store, had discussed Callahan's payment, and had agreed that the arson would be committed that evening. It is likely that when Callahan left his store, Gabriel fully expected that Callahan would return that evening to "torch" the store. There is evidence in the record of Gabriel's attempts to postpone and delay the arson, and his refusals to assist Callahan by giving him a key or buying rubbing alcohol, but the jury could have determined that these actions, again, were an effort to distance himself from the arson to avoid prosecution. Taking inferences in the government's favor, there is sufficient evidence of Gabriel's intent to attempt arson to sustain his conviction on that count.

### III. ENTRAPMENT

Badie Abdulahad alleges on appeal that the government did not prove beyond a reasonable doubt that he was not entrapped with respect to the offenses charged. According to the general rule of this circuit, a defendant may not plead entrapment at the same time as he denies elements of the crime charged.[6] *See United States v. Mathews*, 803 F.2d 325, 327 (7th Cir.1986); *United States v. Rodgers*, 755 F.2d 533, 550 (7th Cir.), *cert. denied,* — U.S. ——, 105 S.Ct. 3532, 87 L.Ed.2d 656 (1985); *United States v. Nicosia*, 638 F.2d 970, 972–73 (7th Cir.1980), *cert. denied,* 452 U.S. 961, 101 S.Ct. 3110, 69 L.Ed.2d 972 (1981); *United States v. Johnston,* 426 F.2d 112, 114 (7th Cir.1970). Applying this rule, we therefore find that because Abdulahad denied the charges of

conspiracy, solicitation, and attempted arson, he is precluded from presenting the defense of entrapment.

Were we to allow Abdulahad to raise the entrapment defense, we would nonetheless find that the evidence was sufficient for the jury to reject that defense. The jury did receive an instruction on entrapment and rejected the defense. The question before us is whether there was sufficient evidence for the jury to find that Abdulahad was predisposed to commit the crimes charged. We must determine "whether, looking at the evidence in the light most favorable to the government, a jury could conclude beyond a reasonable doubt that defendant was predisposed" to commit the crime charged. *United States v. Hinkle,* 637 F.2d 1154, 1158 (7th Cir. 1981) (footnote omitted); *United States v. Townsend,* 555 F.2d 152, 156–57 (7th Cir.), *cert. denied,* 434 U.S. 897, 98 S.Ct. 277, 54 L.Ed.2d 184 (1977). A predisposed defendant is one who is ready and willing to commit an offense apart from government encouragement, and not an innocent person in whose mind the government implanted a disposition to commit an offense. *United States v. Fields,* 689 F.2d 122, 124 (7th Cir.), *cert. denied,* 459 U.S. 1089, 103 S.Ct. 573, 74 L.Ed.2d 935 (1982); *Sorrells v. United States,* 287 U.S. 435, 441–42, 53 S.Ct. 210, 212–13, 77 L.Ed. 413 (1932).

We find that there is sufficient evidence of Abdulahad's predisposition. Abdulahad argues that the evidence indicates his reluctance to have Callahan commit arson, and thus that he was not predisposed. He contends that he sought to postpone the arson by lying to Callahan about band equipment in the basement of his restaurant, that he refused to give Callahan a key to his restaurant to ensure that Callahan would not carry out the arson, and finally, that in their last meeting he tried to put off the

---

**6.** This court has recently refused to change the rule requiring the defendant wishing to plead entrapment to admit all elements of the crime. *See United States v. Mathews,* 803 F.2d 325, 327 (7th Cir.1986). In *Mathews,* this court rejected the appellant's suggestion, relying on *United States v. Rodgers,* 755 F.2d 533, 550 (7th Cir.),

*cert. denied,* 473 U.S. 907, 105 S.Ct. 3532, 87 L.Ed.2d 656 (1985), that we change the rule to require that the defendant admit only the *acts* of a crime, and not the intent, before being allowed to plead entrapment. *Mathews,* 803 F.2d at 326–27.

arson by asking for different insurance coverage. We have recognized that a defendant's reluctance to commit an offense is a factor indicating lack of predisposition. *See United States v. Thoma,* 726 F.2d 1191, 1197 (7th Cir.), *cert. denied,* 467 U.S. 1228, 104 S.Ct. 2683, 81 L.Ed.2d 878 (1984); *United States v. Kaminski,* 703 F.2d 1004, 1008 (7th Cir.1983). Viewing the evidence in the government's favor, however, *see Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), we find that this reluctance could indicate a state of mind not inconsistent with that of predisposition. The jury could have interpreted Abdulahad's reluctance as an attempt to disassociate himself from the crime because of a fear that he would be prosecuted if caught. *See, e.g., United States v. Steinberg,* 551 F.2d 510, 514 (2d Cir.1977) (defendant's reluctance may have been an attempt to protect against prosecution).

Abdulahad also argues that his lack of predisposition is supported by evidence indicating that it was Callahan who initiated talk of the arson and encouraged the idea of an arson. The jury could have determined from the evidence, however, that Abdulahad intended to associate with Callahan not because he wanted insurance, but because he wanted insurance proceeds from the fire. In one of their early meetings, Abdulahad agreed with Callahan that Abdulahad should keep the insurance he had and not seek new insurance coverage even though it would soon be cancelled. It was not until their very last meeting that Abdulahad insisted on having Callahan obtain a different insurance policy. Abdulahad's interest in the arson is bolstered by evidence that he believed, because Gabriel had told him, that Callahan was an arsonist and that a condition of the insurance was that Callahan would commit the arson. The jury could have thought that this knowledge motivated Abdulahad to discuss arson with Callahan on several occasions.

Callahan merely provided an opportunity for Abdulahad to have the arson committed. We have held that "offer[ing] an opportunity to commit a crime, coupled with

what can at most be described as mild inducement, does not support a claim of entrapment." *United States v. Thoma,* 726 F.2d 1191, 1198 (7th Cir.) (citing *United States v. Townsend,* 555 F.2d 152, 155 (7th Cir.), *cert. denied,* 434 U.S. 897, 98 S.Ct. 277, 54 L.Ed.2d 184 (1977)), *cert. denied,* 467 U.S. 1228, 104 S.Ct. 2683, 81 L.Ed.2d 878 (1984); *see also United States v. Perry,* 478 F.2d 1276, 1278 (7th Cir.) ("Mere solicitation is not enough to show entrapment."), *cert. denied,* 414 U.S. 1005, 94 S.Ct. 363, 38 L.Ed.2d 241 (1973). Thus we find sufficient evidence of predisposition to persuade a rational jury beyond a reasonable doubt that Abdulahad was not entrapped.

For the foregoing reasons, the judgment as to both defendants is

AFFIRMED.