**UNITED STATES of America**

v.

**James P. McNEILL, Appellant.**

**No. 89–3255.**

United States Court of Appeals, Third Circuit.

Submitted Under Third Circuit Rule 12(6) Oct. 2, 1989.

Decided Oct. 11, 1989.

George E. Schumacher, Federal Public Defender, David G. Rothey, Asst. Federal Public Defender, Pittsburgh, Pa., for appellant.

Charles D. Sheehy, Acting U.S. Atty., Robert R. Leight, Asst. U.S. Atty., Pittsburgh, Pa., for appellee.

Before SLOVITER, GREENBERG and ROSENN, Circuit Judges.

## OPINION OF THE COURT

SLOVITER, Circuit Judge.

### I.

Appellant James P. McNeill appeals from his conviction following a jury trial of violation of 18 U.S.C. § 373(a), knowingly soliciting a person to commit a crime of violence, in this case the murder of McNeill's parole officer.

Because the offense took place after November 1, 1987, the Sentencing Reform Act was used in calculating McNeill's sentence. He was sentenced to a term of imprisonment of 96 months, a special assessment of $50.00, and to three years' supervision after release. The court denied McNeill's motion to reduce the range of sentencing because of what McNeill claimed was double factoring of the federal officer status of the intended victim.

McNeill filed a timely notice of appeal. On appeal, McNeill argues that there was insufficient evidence as a matter of law on which to base the conviction, that the trial court erred in limiting examination and cross-examination, and that he was subjected to double jeopardy in the application of the Sentencing Guidelines. We will consider each contention in turn.

### II.

The solicitation statute under which McNeill was convicted provides,

> (a) Whoever, with intent that another person engage in conduct constituting a felony that has as an element the use, attempted use, or threatened use of physical force against property or against the person of another in violation of the laws of the United States, and under circumstances strongly corroborative of that intent, solicits, commands, induces, or otherwise endeavors to persuade such other person to engage in such conduct, shall be imprisoned not more than one-half of the maximum term of imprisonment or fined not more than one-half of the maximum fine prescribed for the punishment of the crime solicited, or both; or if the crime solicited is punishable by life imprisonment or death, shall be imprisoned for not more than twenty years.

18 U.S.C. § 373(a).

McNeill argues that the evidence of solicitation to commit a violent crime was insufficient to convict him. In reviewing a claim

of insufficiency of the evidence after a guilty verdict, the court must view the evidence and the inferences logically deducible therefrom in the light most favorable to the government, to determine if there is sufficient evidence to support the factfinder's verdict. *See Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Clapps,* 732 F.2d 1148, 1150 (3d Cir.), *cert. denied,* 469 U.S. 1085, 105 S.Ct. 589, 83 L.Ed.2d 699 (1984); *United States v. United States Gypsum Co.,* 600 F.2d 414, 416–17 (3d Cir.), *cert. denied,* 444 U.S. 884, 100 S.Ct. 175, 62 L.Ed.2d 114 (1979). "Only when the record contains no evidence, regardless of how it is weighted, from which the jury could find guilt beyond a reasonable doubt, may an appellate court overturn the verdict." *Brandom v. United States,* 431 F.2d 1391, 1400 (7th Cir.1970), *cert. denied,* 400 U.S. 1022, 91 S.Ct. 586, 27 L.Ed.2d 634 (1971).

■ Inferences from established facts are accepted methods of proof when no direct evidence is available so long as there exists a logical and convincing connection between the facts established and the conclusion inferred. *See United States v. Bycer,* 593 F.2d 549, 551 (3d Cir.1979). The fact that evidence is circumstantial does not make it less probative than direct evidence. *Id.*

■ The parties agree that to establish the crime of solicitation the government must prove by "strongly corroborative circumstances" that the defendant had the intent that another person engage in conduct constituting a crime described in Title 18, *see United States v. Gabriel,* 810 F.2d 627, 635–36 (7th Cir.1987), and that the defendant actually commanded, induced or otherwise endeavored to persuade the other person to commit the felony, *see United States v. Buckalew,* 859 F.2d 1052 (1st Cir.1988). *See* S.Rep. No. 225, 98th Cong., 2d Sess. 308 (1984), *reprinted in* 1984 U.S. Code Cong. & Admin.News 3182, 3488. "The phrase 'otherwise endeavors to persuade' is designed to cover any situation where a person seriously seeks to persuade another person to engage in criminal con-

duct." S.Rep. No. 97–307, 97th Cong. 1st Sess. 183–84 (1982).

The Senate Report lists examples of "strongly corroborating circumstances" that are "highly probative" of intent to solicit:

(i) the fact that the defendant offered or promised payment or some other benefit to the person solicited if he would commit the offense;

(ii) the fact that the defendant threatened harm or other detriment to the person solicited if he would not commit the offense;

(iii) the fact that the defendant repeatedly solicited the commission of the offense, held forth at length in soliciting the commission of the offense, or made express protestations of seriousness in soliciting the commission of the offense;

(iv) the fact that the defendant believed or was aware that the person solicited had previously committed similar offenses;

(v) the fact that the defendant acquired weapons, tools, or information suited for use by the person solicited in the commission of the offense, or made other apparent preparations for the commission of the offense by the person solicited.

S.Rep. No. 307, 97th Cong., 1st Sess. 183 (1982) (footnotes omitted). However, as the *Gabriel* court stated, the above factors "are not exclusive or conclusive indicators of intent to solicit." *Gabriel,* 810 F.2d at 635 (footnote omitted). Indeed, the Senate Committee that considered a precursor to section 373 emphasized that " 'the existence of strongly corroborative circumstances [is] a question of fact for the jury.' " *Id.* at 635 n. 5 (quoting S.Rep. No. 307, 97th Cong. 1st Sess. 183 (1982)).

■ We turn therefore to an examination of the record in this case. The government produced evidence that McNeill was incarcerated at the Federal Correctional Institution in Loretto, Pennsylvania, and that during his incarceration McNeill had expressed animosity toward his probation officer, Edward J. Kosheba, in several conversations with inmates and corrections officers. One fellow inmate testified that

McNeill had threatened to shoot Kosheba or use explosives to blow up his automobile. Kerry Anthony, the government's principal witness, who was also an inmate at Loretto, gave McNeill the name and address of "Timothy Anthony," who he pretended was his brother, as someone who could carry out McNeill's threats after McNeill approached him at least six times for help in recruiting a hitman. "Timothy Anthony" was an alias for DEA Special Agent Timothy Bucher who had worked with the prosecution of Anthony on drug charges, and with whom Anthony thereafter cooperated.

Timothy Bucher received two letters, both addressed to "Timothy Anthony." The first, dated August 16, 1988 and received on August 22, solicited an attack against McNeill's brother-in-law, Meril Winnick. The letter read:

> DEAR TIM,
>
> IN REFERENCE, TO THE CONVERSATION YOUR BROTHER AND I HAD ABOUT, A CERTAIN MAN NAMED *MERIL WINNICK*, ALL I CAN FIND OUT, IS THAT HE LIVES IN THE SUBURBS OF PHILADELPHIA, PA. HAS AN UNLISTED PHONE NUMBER, BUT HE IS THE ONLY ONE LISTED IN THAT AREA. HE ALSO, IS THE MANAGER OF A SELF GAS STATION, I DON'T KNOW THE NAME OF IT, IN FACT THERE ARE SEVERAL OF THEM IN PHILADELPHIA. HIS WIF'S * * NAME IS ALICE, THEY GOT RE-MARRIED, SOME TIME IN 1986. HE'S BEEN IN THAT AREA FOR AT LEAST 20 YEARS. HE'S PAST 50 YEARS OLD, MAKE SURE THIS PIECE OF CRAP HAS SOME BAD PERMANENT INJURIES, AND I HOPE YOU CAN GET IT DONE BEFORE LABOR DAY, BECAUSE I'M SURE HE WILL MAKE ANOTHER ATTEMPT * * ON MY WIFE.
>
> VERY SINCERELY,
> JAMES P. MCNEILL

App. at 355, Govt. Ex. 5.

The second letter, dated August 24, 1988 and received on August 29, which solicited the murder of Kosheba, read:

> DEAR TIM;
>
> AS I SAID BEFORE, THE THING CALLED *MERIL WINNICK*, MIGHT COME UP TO HIS MOTHER'S ON LABOR DAY WEEKEND. SO BE SURE AND DON'T LET THAT HAPPEN, I WANT HIM BROKE UP LIKE CORDWOOD, BUT ALIVE, JUST BARELY. THE SUBJECT I'M ABOUT, TO TALK ABOUT, I WANT HIM EXTERMINATED, OR CANCELLED OUT, HOWEVER YOU * * * WANT TO SAY IT. HIS NAME IS *EDWARD J. KOSHEBA*, HE'S A PROBATION OFFICER OUT OF HARRISBURG, PA. FOR THE FEDS. HE WORKS IN THE *FEDERAL * * * * * * * * BUILDING AT 3RD & WALNUT * * * IN HARRISBURG, PA.,* * * * * * * * * * * * * * I REPEAT HE WORKS AT THE FEDERAL BUILDING AT 3RD & WALNUT IN HARRISBURG, PA., * * * * *10TH FLOOR, ROOM* # 1036, BUSINESS PHONE IS * * * AREA CODE * * * (717) 782-2259. HIS RESIDENCE IS IN *BOILING SPRINGS, PA., SOMETHING DOGWOOD TERRACE, BOILING SPRINGS, PA., IS A SUBURB OF HARRISBURG, PA., BUT THE BEST PART * * * * IS, HE HAS A LISTED PHONE NUMBER COMPLETE WITH HIS ADDRESS RIGHT OUT OF THE HARRISBURG, PA., PHONE BOOK. BE CAREFUL, BECAUSE HIS OFFICE, IS ON THE SAME FLOOR AS THE U.S. MARSHALL SERVICE.* AS SOON AS YOU, CAN DO THIS, PIECE OF * * * * * * * GARBAGE IS FINE WITH ME.
>
> \* \* \* \* \* \*
>
> YOUR BROTHER'S FRIEND,
> JIM.

App. at 356, Govt. Ex. 7. The solicitation of Kosheba's murder formed the basis of the indictment.

No fingerprints of any utility were found on either letter, nor was the typewriter which was found in McNeill's room during a search on August 31, 1988 positively identified as the one used to type the letters. McNeill introduced evidence at trial that inmates frequently transfer among them-

selves articles such as typewriters despite the existence of a sign-out policy, and also that inmates' rooms at Loretto are never locked. The typewriter sign-out sheet for August 1988 was lost.

One of the theories suggested at trial by McNeill's counsel was that Kerry Anthony had actually sent the letters soliciting Timothy Bucher. There was evidence that during a recorded telephone conversation between Anthony and an agent at the DEA office to which the letters were sent, Anthony, in response to questions about who had sent the letters and whether they concerned drug dealers, stated that he "had someone else do it" and "it's something else that I couldn't get another address, so I sent it to Tim." App. at 360. Later, in the same telephone conversation with the DEA agent, Anthony had stated that McNeill was "recruitin' people" and that Anthony "got into the conversation [b]efore he actually found somebody to do it." App. at 365. At trial, Anthony disavowed that his earlier statements in the telephone conversation meant that he had personally sent the letters, App. at 132, and explained that he "figured [he] better route it before [McNeill] found somebody who really would [carry out the contract]." App. at 136–37.

Although there is no direct evidence linking McNeill to the letters, we conclude that there is adequate circumstantial evidence from which a jury could have found that McNeill committed the offense of solicitation of the murder of his probation officer. As to the intent prong of the crime, the government presented evidence through Anthony that McNeill had approached Anthony at least six times, repeatedly inquiring into the possibility of Anthony procuring somebody to kill Kosheba, App. at 111–13, and that McNeill had told him that he would obtain the money to pay a hitman by robbing an elderly lady residing in his hometown of $20,000 hidden in her home while on furlough. App. at 115. There was also evidence from which the jury could have inferred that this woman was McNeill's mother-in-law. App. at 159. The jury was entitled to credit Anthony's testimony. In addition, there was testimony of inmates and corrections officers at Loretto that McNeill made threats against Kosheba from which the jury could have reasonably concluded that McNeill was serious in soliciting someone.

Likewise, the government produced sufficient evidence that McNeill had authored the letters soliciting Bucher. In the first place, the second letter referred to the first, thereby strongly suggesting they were written by the same person. The first letter contained numerous accurate details about McNeill's brother-in-law (the subject of the proposed attack) which were not likely to be generally known, such as the spelling of Winnick's name, his age, address and employment, his marital status and his holiday plans. The jury could reasonably have accepted the government's argument that these were details known to McNeill, but not Anthony, and could have therefore inferred that McNeill wrote both letters.

In the second place, there was the circumstantial evidence that McNeill had signed out a typewriter nearly every night in June, July, and August 1988, that the typewriter recovered from McNeill's cell corresponded in design and size of type to the one that typed the letters of August 16, 1988 and August 24, 1988, and that the typewriter had the unique identifying characteristic that the "E" printed slightly low and tilted backwards, as did the typewriter used to type the two letters. App. at 195–204. Moreover, other letters concerning McNeill's problems with Kosheba were found in McNeill's room in a search conducted seven days after the second letter was sent to Bucher. App. at 54–57. We see no reason why this evidence in its totality was not sufficient to permit a jury to find McNeill guilty of the offense of solicitation.

### III.

In order to prove that Anthony instigated the solicitation, McNeill sought to introduce the testimony of several other inmates concerning various criminal acts for which Anthony had solicited them. The

district court limited testimony by these defense witnesses to their opinions as to Anthony's character and reputation and excluded testimony of these prior specific instances of conduct. McNeill argues that this ruling denied him his Fifth Amendment right to due process and his Sixth Amendment right to compulsory process.

Trial court rulings on the admission of evidence are reviewed under an abuse of discretion standard. *See In re Japanese Electronic Products*, 723 F.2d 238, 260 (3d Cir.1983), *rev'd on other grounds, Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). At trial and on appeal McNeill argues that testimony concerning Anthony's solicitations was admissible under Fed.R.Evid. 607 to show prejudice, bias or interest. App. at 102–03, 36–71; Appellant's Brief at 13–14. However, Anthony's alleged solicitations of other inmates for criminal activities do not suggest any bias against McNeill. The district court, therefore, appropriately based its decision solely on Rule 608.

■ Fed.R.Evid. 608(b) provides that "[s]pecific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of a crime as provided in rule 609, may not be proved by extrinsic evidence." The prohibition against impeachment by extrinsic testimony goes back nearly 300 years to the courts of seventeenth century England. *See Rookwood's Trial*, 13 How.St.Tr. 139, 209 (1696), *quoted in* J. Wigmore, 3A *Wigmore on Evidence* § 979, at 823–24 (1970 Revision).

Extrinsic evidence is evidence offered through other witnesses, rather than through cross-examination of the witness himself or herself. This court has construed Rule 608(b) as requiring the exclusion of extrinsic impeachment evidence concerning a witness' prior instances of conduct. *See United States v. Agnes*, 753 F.2d 293, 304–05 (3d Cir.1985); *United States v. Oxman*, 740 F.2d 1298, 1303 (3d Cir.1984); *United States v. Herman*, 589 F.2d 1191, 1196–97 (3d Cir.1978), *cert. denied*, 441 U.S. 913, 99 S.Ct. 2014, 60 L.Ed.2d 386 (1979). In light of this precedent, the trial court's preclusion of the extrinsic evidence of Anthony's alleged solicitations was consistent with prevailing law.

■ We turn then to the trial court's ruling that barred cross-examination of Anthony about prior solicitations by him. Such cross-examination is, of course, not extrinsic evidence and hence is not barred for that reason. However, under Fed.R. Evid. 608(b), there may be cross-examination into the prior conduct of a witness only if the trial court determines that the conduct is probative of the witness's truthfulness or untruthfulness, a ruling that is within the discretion of the trial court. In *United States v. Bocra*, 623 F.2d 281, 287–88 (3d Cir.), *cert. denied*, 449 U.S. 875, 101 S.Ct. 217, 66 L.Ed.2d 96 (1980), a case raising a virtually identical issue, we upheld the trial court's ruling that the defense was barred from cross-examining the witness about an alleged pattern of solicitations because "we [saw] any cross-examination ... as only marginally probative of truthfulness." *Id.* at 288.

In this case, the court did permit extrinsic testimony by other inmates concerning Anthony's reputation for truthfulness or untruthfulness, as permitted by Fed.R. Evid. 608(a), which allows an attack on the credibility of a witness through opinion testimony concerning the witness' character for truthfulness or untruthfulness. Furthermore, the court permitted defense counsel to cross-examine Anthony regarding his plea agreement with the government, as well as any and all favors he received and the fact that his sentence was reduced in half as a result of his cooperation. Because the court permitted both cross-examination of Anthony into any potential bias in Anthony's testimony and examination of the defense witnesses as to Anthony's reputation for truthfulness *vel non*, we reject McNeill's argument that he was denied due process of law. In resolving the tension between the admissibility of evidence under the bias theory and the inadmissibility of the same evidence under the character theory, it is significant that

the court permitted defendant to introduce evidence intended to impeach Anthony by other means. *See United States v. De-Leon,* 498 F.2d 1327, 1332 (7th Cir.1974). The jury was in possession of sufficient information to make a discriminating appraisal of Anthony's possible motives for testifying falsely in favor of the government. *See United States v. Turcotte,* 515 F.2d 145, 151 (2d Cir.), *cert. denied,* 423 U.S. 1032, 96 S.Ct. 564, 46 L.Ed.2d 406 (1975).[1]

Appellant relies on *Washington v. Texas,* 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967), to support his contention that he was denied due process and compulsory process by the exclusion of his witnesses' testimony relating to Anthony's solicitation of them. In *Washington,* the Supreme Court invalidated a state procedural rule completely barring accomplices from testifying for the defense, on the ground that arbitrarily barring a witness' relevant testimony violates due process. *Id.* at 23, 87 S.Ct. at 1925. This case is different because the trial court held that the excluded evidence was irrelevant, *cf. Washington,* 388 U.S. at 16, 87 S.Ct. at 1921–22 (accomplice's testimony that he had fired the fatal shot clearly relevant), and because McNeill's witnesses were not completely barred from testifying, but rather were permitted to give all relevant testimony. Thus, appellant's reliance on *Washington* is misplaced. Under all the circumstances, we cannot hold that the trial court's evidentiary rulings rose to the level of abuse of discretion.

## IV.

■ McNeill's final argument is that he was subjected to cumulative punishment for the same offense when the trial judge added 3 points to his base offense level of 20 because of the intended victim's status as a federal officer. We exercise plenary review in determining whether the district court misapplied the Sentencing Guidelines. *See United States v. Uca,* 867 F.2d 783,

786 (3d Cir.1989); *United States v. Medeiros,* 884 F.2d 75 (3d Cir.1989).

Specifically, McNeill contends that the Sentencing Commission, when drafting the Guidelines to the Sentencing Reform Act of 1984, had already accounted for official victims under section 2A2.1 so that the addition of 3 points constituted double counting. *See* 18 U.S.C. § 3553(b) (Supp. V 1987) (court to ascertain if "there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described.")

Section 2A2.1 of the Sentencing Guidelines sets a base offense level of 20 for violation of 18 U.S.C. § 373(a) (solicitation to commit a crime of violence). Section 3A1.2 provides for a 3 point enhancement for official victims. In this case, because McNeill was convicted of solicitation to murder his United States Probation Officer, the victim enhancement applies. However, the Commentary to section 3A1.2 states that this adjustment is not applicable if the offense guidelines specifically incorporate this factor.

McNeill appears to argue that because 18 U.S.C. § 1114 (protection of officers and employees) covers, *inter alia,* United States Probation Officers and that offense also has a base level of 20, the Sentencing Commission has already taken the status of the victim into account in fixing the offense level of 18 U.S.C. § 373(a). Appellant's Brief at 20. There is no logical support for this argument. Nothing in 18 U.S.C. § 373(a) suggests that it is dependent in any way on the official status of the victim, any more than are some of the other offenses also subject to section 2A2.1, *i.e.,* assaults within the maritime and territorial jurisdiction of the United States and assaults on Indian lands. Of course, had McNeill been convicted of a crime which specifically incorporated official victims as

---

1. We note that appellant has not argued here, nor in the district court, that the alleged solicitations were admissible under Fed.R.Evid. 404(b)

as showing a pattern, and hence we do not consider this issue.

an element, such as 18 U.S.C. § 1114, his argument might have greater merit.

 McNeill, however, also relies on the Commentary to Section 2A2.1, which provides:

Enhancements are provided for planning, weapon use, injury, and commission of the crime for hire. All of the factors can apply in the case of an assault; only the last can apply in the case of a conspiracy that does not include an assault; and *none can apply in the case of a mere solicitation.*

(emphasis added). McNeill argues that because the Commentary explicitly notes that no enhancements should apply in the case of mere solicitation, "the Sentencing Commission fully accounted for a sentence pursuant to Title 18, U.S.C. 373(a) pertaining to an official victim under Section 2A2.1." Appellant's Brief at 19.

McNeill's argument is both illogical and contrary to the plain language of Section 1B1.1 (the Application Instructions). The type of enhancements referred to in the Commentary to Section 2A2.1 are "specific offense characteristics," which are set out in subsection (b) of 2A2.1. These are to be distinguished from the "Victim–Related" enhancements which are found in Chapter Three of the Guidelines. The Application Instructions to the Sentencing Guidelines provide that the sentencing judge is to determine a defendant's sentence in the following manner:

(a) Determine the guideline section in Chapter Two most applicable to the statute of conviction.

. . . . .

(b) Determine the base offense level and apply any appropriate specific offense characteristics contained in the particular guideline in Chapter Two in the order listed.

(c) Apply the adjustments as appropriate related to victim, role, and obstruction of justice from Parts A, B, and C of Chapter Three.

§ 1B1.1.

In this case, the enhancements were added pursuant to the third step, not the second step of the instructions. "Victim–Related Adjustments" under Chapter 3 of the Guidelines may be added if appropriate, regardless of the offense characteristics under Chapter 2. We conclude, therefore, that the sentencing judge properly followed the instructions in increasing the base offense level by 3 points. It follows as well that there is no basis for McNeill's double jeopardy argument.

## V.

For the reasons set forth above, we will affirm the judgment of sentence entered by the district court.