UNITED STATES of America, Plaintiff,

v.

William E. MILLER, William L. Phillips, Barbara Pumphrey, Brian Ahern, Sherry J. Mitchell, Defendants.

No. IP 90–91–CR.

United States District Court,
S.D. Indiana,
Indianapolis Division.

Jan. 25, 1991.

See also 761 F.Supp. 1382.

Christina McKee, Office of U.S. Atty., Indianapolis, Ind., for the Government.

James H. Voyles and Dennis E. Zahn, Ober, Symmes, Cardwell, Voyles & Zahn, Indianapolis, Ind., for defendant Brian Ahern.

Jeffrey K. Baldwin, Indianapolis, Ind., for defendant Sherry J. Mitchell.

## ENTRY ON DEFENDANT BRIAN AHERN'S MOTION FOR ACQUITTAL

TINDER, District Judge.

Counsel for defendant Brian Ahern moved for a judgment of acquittal at the close of the government's case. His motion was taken under advisement at that time, and he rested without presenting evidence. After the instructions were read to the jury, counsel for Ahern renewed the motion and the court retained the motion under advisement. Following the return verdicts of guilty against Ahern by the jury on January 17, 1991, this court announced that a judgment of acquittal would be entered in favor of defendant Ahern. This entry memorializes that decision and will be followed by a separate written judgment of acquittal as indicated below.

## GENERAL BACKGROUND

Brian Ahern first became acquainted with William Miller in California approximately twelve (12) years ago. They worked together in a health club business and became friends during the course of their employment. In fact, they began sharing a residence as roommates, an arrangement which continued for about eight

(8) years. Their involvement in the health club business led to their relocation to Lafayette, Indiana in 1983 to operate a health club facility and eventually led them to Indianapolis for the same purpose.

As of 1984, Ahern and Miller were involved in the business of running a health club in the Speedway area of Indianapolis. Ahern's role was the management of the day-to-day operations and personnel while Miller was responsible for the membership sales aspect of the business. During the operation of the health club, Miller became acquainted with a customer named William Phillips. Phillips worked in the real estate business, and Miller developed an interest in that business which ultimately resulted in his leaving the health club in 1985 to go into business with Phillips.

Ahern and Miller remained roommates after their business involvement ended; however, their schedules and work interests were not compatible. For example, Ahern's job required his attention seventy or more hours a week and their paths did not cross on work projects, so they saw very little of each other. Nonetheless, they remained friends.

The strength of that friendship could be measured by the fact that Ahern loaned between thirty and forty thousand dollars to Miller, without requiring Miller to sign a note, make regular payments or otherwise account for these funds.[1] Ahern was well compensated for his employment, making as much as seventy-five thousand dollars per year.

Miller and Phillips had a third partner in the real estate business, Chris Wood. The principal method of operation of their business was to locate, purchase and renovate older properties for resale or rental. The responsibilities for this business were divided as follows: Phillips was to locate and rehabilitate the properties, Miller was to manage the rental properties and the office, Wood was to secure financing for the projects.

1. Miller's testimony was that the loan was made to Miller, Phillips and Wood but the tenor of the testimony indicated that the loan was made as a result of Ahern's friendship with Miller.

In the spring of 1987, this enterprise acquired three buildings located on West Fall Creek Boulevard in Indianapolis, at 43, 45 and 51 West Fall Creek, South Drive (Buildings 43, 45, and 51). Wood acquired title to Buildings 43 and 51. Miller and Phillips obtained title to Building 45, but later conveyed title for that property to Wood. Each building was subject to division into four condominium units. Efforts at rehabilitation began, but the expenses quickly exceeded what the partners had anticipated. More money was needed, and the conventional methods of borrowing such funds did not appear to be available. Chris Wood went to a bank to obtain additional financing, but was unsuccessful. William Phillips then consulted with an acquaintance, Barbara Pumphrey, at a mortgage company, Lakeland Mortgage ("Lakeland"), and a scheme for obtaining money was devised.

The three buildings were to be conveyed from Wood, Miller and Phillips to third parties who would then serve as "strawmen," or mere nominal owners. The three buildings, subdivided into four condominiums each, would then be sold back to Miller and Phillips, the total cost of which would exceed the amount that Wood, Miller and Phillips already owed on the buildings. Financing for the Miller and Phillips purchases would be obtained from a private mortgage lender, and the proceeds of the "sales" would be used to pay off any amounts already owed on the buildings and the balance would be given back to Miller and Phillips so that they would have additional funds for rehabilitation of the buildings. However, the execution of this scheme posed some additional problems that Miller and Phillips attempted to overcome through criminal treachery.[2]

First, Miller and Phillips had to appear to qualify for the mortgage loans that were to be obtained. Because their financial circumstances were rather weak at the time, they concealed indebtedness and overstated their income on the loan applications.

Next, the purchase of the condominiums by Miller and Phillips had to appear to be an "arms-length" transaction. Miller and Phillips had to locate one or more strawmen who would appear on record to purchase, and later, sell the properties in question. Title to the properties would initially be transferred to the strawmen, and then transferred back to Miller and Phillips in connection with the "sales." Since the proceeds of the "sales" were needed to be plowed back into the Miller/Phillips business, the straw owners had to be willing to let that occur. In other words, the ideal strawman would be a person willing to lend his or her name to the sale transaction without asking for compensation. The strawman would be expected to sign various documents in connection with the sales, including deeds, closing statements and checks.

Third, a closing would have to be held during which the documents effectuating the sales from the strawmen would be signed, the mortgage loan would be granted and checks would be issued to pay any existing indebtedness on the properties, the costs of closing and the straw-owners for their "equity" in the properties. Finally, the straw-owners would have to return the proceeds of their checks to Miller and Phillips.

As complicated as this scheme appears to be at first glance, a detailed examination of it reveals an even more circuitous sequence of events. The loans for Miller and Phillips were to be insured under a program of the Department of Housing and Urban Development ("HUD"). This would eventually require the submission of various documents, signed at the closings to that agency. Thus, any false statements made in those documents would be potentially subject to prosecution under 18 U.S.C. § 1010.[3]

---

**2.** Although he was a partner in the Miller/Phillips business, Chris Wood was not indicted nor did he testify at trial. Indeed, after Wood deeded the buildings in question to Ahern in July and December of 1987, his name was not mentioned at trial. Because his presence is largely irrelevant to the issues presented in this entry, for ease of reference Miller and Phillips are referred to as the principal owners of the Miller/Phillips real estate business.

**3.** 18 U.S.C. § 1010 reads as follows:

The mortgage company that Miller and Phillips were hoping to use on these transactions, Lakeland Mortgage, stopped making mortgage loans just before they were about to close these deals. Lakeland's loan officer, Barbara Pumphrey, went with another company, National Mortgage, and she was able to place the loans there. However, National Mortgage would only quote mortgage interest rates and point fees for a twelve hour period of time. So, when the mortgage applications for Miller and Phillips were approved, they had to close the loans the same day in order to insure the same interest rate and points.

Twelve (12) separate loans were involved on the condominiums; so, effectively twelve different loan closings had to be held in one evening to accomplish the transactions. According to the chief of the mortgage credit branch of the Indianapolis HUD office, at least forty-five (45) separate pieces of paper would be involved in each such closing, twenty-five (25) of which would have to be signed by the buyer and the seller. Since twelve (12) condominiums in total were involved, the scene described of the closings of January 13, 1988, held on these properties resembled a blizzard of paperwork.

Miller and Phillips also had to show the lender, and presumably HUD, that they were qualified to obtain the mortgages. In order to do so, they had to produce evidence that they had made sufficient earnest money payments on the condominiums. The source of the funds for those down payments had to be disclosed also, because HUD regulations and sound lending practices forbade borrowing the funds utilized for these down payments. Miller went through a series of fraudulent gyra-

tions to fulfill that requirement. He first borrowed $70,000 from Frank Jackson. Sales documents were then concocted to purport that Jackson purchased a house from Miller and paid the $70,000 purchase price in cash.

Miller then had a cashiers check made out to Brian Ahern in the amount of $51,-500. This check purported to be the down payment on the eight condo units to be purchased from Ahern. Miller then directed Ahern to endorse the check and hand it back. A copy of the check was made, and Miller submitted it to loan officer Pumphrey to document the loan file. Finally, the check was cashed and the funds were returned to Frank Jackson.

As might be expected, Miller and Phillips were unable to keep up with the mortgage payments and were unsuccessful at renovating the properties and selling them to pay off the mortgage indebtedness. HUD satisfied its obligation as the mortgage insurer and began an inquiry into the peculiar circumstances of these transactions.

As the scheme (described by Miller and Phillips as "creative financing") unraveled, Miller, Phillips, Pumphrey, Ahern and Sherry J. Mitchell were indicted for a conspiracy to submit false statements to obtain loans with the intent that the loans would be insured by HUD. In addition, each defendant was charged with multiple substantive counts of making false statements to obtain loans with the intent that HUD would insure the loans.

At issue before this court on the defendant's motion for acquittal is the conspiracy count and the eight substantive counts in which Brian Ahern is named as a defendant. Because no evidence was produced to show that the defendants met as a group

---

Whoever, for the purpose of obtaining any loan or advance of credit from any person, partnership, association, or corporation with the intent that such loan or advance of credit shall be offered to or accepted by the Department of Housing and Urban Development for insurance, or for the purpose of obtaining any extension or renewal of any loan, advance of credit, or mortgage insured by such Department, or the acceptance, release, or substitution of any security on such a loan, advance of credit, or for the purpose of influencing in any way the action of such Department, makes, passes, utters, or publishes any statement, knowing the same to be false, or alters, forges, or counterfeits any instrument, paper, or document, or utters, publishes, or passes as true any instrument, paper, or document, knowing it to have been altered, forged, or counterfeited, or willfully overvalues any security, asset or income, shall be fined not more than $5,000 or imprisoned not more than two years, or both.

to discuss the formation and implementation of the conspiracy, and because there was no evidence of similar conduct regarding the substantive false statements, the government relies principally on the conduct of defendant Ahern, including the circumstances of the offense, to support its claim that Ahern was a knowing and willing participant in both the conspiratorial scheme and the substantive misconduct. Analysis of this motion for judgment of acquittal requires a discussion of all of the evidence regarding Ahern's involvement in these transactions.

## EVIDENCE OF AHERN'S INVOLVEMENT IN THE CONSPIRACY

All three buildings in question were deeded to Ahern. On July 23, 1987, Chris Wood deeded Buildings 45 and 51 to Ahern. (Government Exhibits 78 and 85). On December 17, 1987, Wood deeded Building 43 to Ahern. (Government Exhibit 73). These transfers were not explained during the trial. No evidence was produced to show whether Ahern had ever met Wood, whether he had paid Wood for the transfers, whether he had discussed the transfers or whether he was even aware that the title to those properties had been placed in his name. Indeed, William Miller testified that Ahern was not told that the property was transferred to him before the transfers in question occurred.

Ahern did, however, attend several closings at which he was the nominal seller of properties he had not invested in. On July 31, 1987, Ahern deeded 45 West Fall Creek to Miller. (Government's Exhibit 79). Miller testified that Ahern attended the closing on this building, however, the record reveals no additional information about this transaction.

On October 19, 1987, Ahern deeded Building 51 to Phillips (Government Exhibit 86). Miller also testified that Ahern attended the closing on this property, but there is no additional information in the record with respect to the extent of Ahern's involvement in this closing. Phillips deeded Building 51 back to Ahern on December 17, 1987 (Government Exhibit 88) and then Ahern deeded the four units in that building to Miller as a part of the closing on January 13, 1988. A deed for one of these four transfers was introduced into evidence. (Government Exhibit 89).

Ahern also deeded the units in Building 43 on January 13, 1988, two to Miller and two to Phillips. Again, a deed for one of these four transfers was introduced into evidence. (Government Exhibit 74).

Prior to the January 13, 1988, closing on the twelve (12) condominium units, Ahern was given two cashiers' checks, one from Miller in the amount of $51,500 (Government Exhibit 14) and the other from William Phillips in the Amount of $19,000 (Government Exhibit 22C). He endorsed both of those checks at the request of Miller and returned them to Miller. Ahern also signed letters to the National Mortgage Corporation, which had been prepared by Barbara Pumphrey and which were presented to him by Miller. The letters purported to demonstrate to the National Mortgage Corporation that Ahern had received earnest money from Miller and Phillips to secure the sales of the eight (8) condominium units in buildings 43 and 51. The letter regarding the Miller transfers read as follows:

January 8, 1988

National Mortgage Corp.
P.O. Box 337
Indianapolis, IN 46206-0337

RE: Earnest Money received from Bill Miller

To Whom It May Concern:

This is to further document that on todays (sic) date I received the Earnest Money on the Units in (sic) which he is purchasing at The Commons at Fall Creek.
A total of $51,500.00 was received in the form of a Cashiers Check # 937188606 and should be used on the properties as follows:

| | | |
|---|---|---|
| 1) | 43 West Fall Creek Parkway South Drive Unit 1 | $9,800.00 |
| 2) | 43 West Fall Creek Parkway South Drive Unit 3 | $9,800.00 |
| 3) | 51 West Fall Creek Parkway South Drive Unit 1 | $2,500.00 |
| 4) | 51 West Fall Creek Parkway South Drive Unit 2 | $9,800.00 |
| 5) | 51 West Fall Creek Parkway South Drive Unit 3 | $9,800.00 |
| 6) | 51 West Fall Creek Parkway South Drive Unit 4 | $9,800.00 |

This attaches and becomes part of the Purchase Agreement dated December 19, 1987.

Sincerely,

/s/Brian Ahern/

Brian Ahern
Owner of Buildings 1 & 3 in The Commons on Fall Creek

---

The letter regarding the Phillips transfers was very similar. Both letters were incorporated into purchase agreements for the eight (8) condominiums, which Ahern also signed. (Government Exhibits 1f, 2f, 3f, 4f, 9f, 10f, 11f, 12f).

At the January 13, 1988, closing, Ahern signed eight (8) earnest money receipts (Government Exhibits 1e, 2e, 3e, 4e, 9e, 10e, 11e and 12e) and eight HUD settlement statements (1c, 2c, 3c, 4c, 9c, 10c, 11c and 12c). All of these documents contained language calling attention to the obligation of truth and accuracy imposed by federal law. The earnest money receipt contained the following language at the bottom:

Section 1010 of Title 18, U.S.C. "Federal Housing Administration Transactions", provides "Whoever, for the purpose of influencing in any way the action of such Administration makes, passes, utters, or publishes any statement, knowing the same to be false shall be fined not more than $5,000.00 or imprisoned not more than two years, or both." Other Federal Statutes provide severe penalties for any fraud as intentional misrepresentation made for purpose of influencing the insurance of any guarantee or insurance of the making of any loan by the Administrator of Veterans Affairs.

The settlement statements contained a warning above each of the three signature lines executed by Ahern on each statement. The language which appeared three times on each settlement statement read as follows:

I have carefully reviewed the HUD–1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD–1 Settlement Statement.

In addition, at the bottom of Addendum I (part of the settlement statement) the following warning also appeared:

WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S.Code Section 1001 and Section 1010.

Two days after the closing, Ahern traveled to a bank in Noblesville where he met Miller, Phillips and Sherry Mitchell. While at the bank Ahern endorsed and cashed eight (8) checks which had been made payable to him by the closing agent. (Government Exhibits 28, 30, 32, 42, 44, 46, 48, 50, 51, 52, 53, 56). Ahern allowed Phillips and Miller to leave the bank with all of the cash from those checks. The last contact Ahern had with this matter, prior to his indictment, was the act of providing information for the completion of a Currency Transaction Report (Treasury Form 4789, commonly referred to as a CTR) to a bank security officer. (Government Exhibit 58). The information on the CTR appears to have been accurate and complete, and included

Ahern's address, place of employment and Social Security number.

The fact that Ahern executed the foregoing documents is not in dispute. What this case turns on is the question of what Ahern knew, or should have known, when he placed his signature on the documents. The government contends that he signed the documents as a knowing and willing member of the conspiracy, and Ahern contends that the evidence shows that he signed the documents with the sole knowledge that his friend Miller wanted him to sign them, and that no evidence proves that Ahern was aware of their contents.

The testimony about the circumstances under which the documents at issue were signed was given by four of the six people present at the closing. William Phillips indicated that Ahern was present at the closing and that he believes that Ahern signed the documents. Phillips said that Barbara Pumphrey designed the financing package while at Lakeland Mortgage, and that she put the documentation together for the closing. He further indicated that the only explanation he heard about the documents was a vague one given by Miller. He gave no testimony about the deeds back and forth between he and Ahern on Building 51.

Barbara Pumphrey testified that she knew Brian Ahern because of a real estate loan he had received through Lakeland while she was there. However, she indicated that she did not talk to Ahern at all during the preparation of the documents for the January 13, 1988, closing. Her only conversation with Ahern at the closing was general in nature, and did not touch on the substantive issues of the closing. Pumphrey testified that she did not see Ahern reading the documents. She also indicated that the closing was set on the same date that the loans were approved and that the closing was rushed because she had to drive certain of the closing documents to the airport by midnight.

Kim Patterson Curry was a loan closing officer at the title company which conducted the closings on the January 13, 1988, transactions. Her title company was called

on the afternoon of the 13th by Pumphrey and was requested to conduct the twelve closings by the end of the day. Ms. Curry (then Patterson) indicated that it would take two to three hours just to do the paperwork for the closing of one condominium sale, so that to close twelve in one day, they would have to be done in a real rush.

Ms. Curry had met Ahern on some previous real estate matter and recalled that he arrived at the January 13th closing while the paperwork was being prepared and that he was present at the signings. She gave no testimony about any discussions with Ahern in connection with these closings. Ms. Curry was responsible for the accuracy of the information in the closing documents and she relied on Ms. Pumphrey to provide her with the necessary information. Because of the press of time, she made no explanation of the documents to any of the participants in the closing even though she admitted that it was her duty to explain the documents and generally run the closing.

William Miller was the principal witness against Ahern. Miller testified that after deciding to put the fraudulent deal together, he contacted his friend Brian Ahern and asked him to lend some minor assistance to a "creative financing" project. Ahern agreed to help his friend. Miller told Ahern that in order to put together the creative financing deal, he was going to put some property in his name. Miller told Ahern that he and Phillips were told to do this by the mortgage company. Miller did not discuss the subject of Ahern making an investment in the project. In fact, Ahern made no investment in the Miller–Phillips venture and received no compensation for his assistance.

According to Miller, Ahern knew the "minimum" about the deals. When Miller told Ahern to sign paperwork as the seller on the buildings in question he generally stopped by Ahern's place of business and merely told Ahern that Ahern was signing general paperwork for the creative financing. Miller testified that Ahern would sign the documents without reading them and never asked questions.

Brian Ahern had introduced Miller to Frank Jackson, who owned the health facility at which Ahern was then employed. At the time that Miller directed Ahern to endorse the cashier's check in the amount of $51,500, Miller did tell Ahern that Jackson had loaned him $70,000, however, Ahern was not privy to any of Miller's conversations with Jackson and was not aware of the false sale deal using Jackson's name. Miller testified that he had chosen Ahern because Ahern trusted him, and Miller could "manipulate" him.

There was no evidence that Ahern questioned anything Miller asked him to. do. According to Miller, Ahern was not aware prior to the closings that the titles to the three buildings had been transferred. When Miller presented cashier's checks to Ahern, he told him to sign the back of the checks as part of the creative financing project. Miller testified that the various transactions between Miller and Ahern prior to the January 13, 1988, closing took no more than thirty seconds each and were all accomplished at Ahern's place of business at Miller's instigation and with no explanation other than vague references to "creative financing."

Ahern had no contact with Pumphrey in the preparation of the documents related to the closings. At the closing Miller took all of the documents which had been prepared by Pumphrey to Ahern and merely directed him to sign them.

On the day of the closing Miller called Ahern and told him he would need his assistance that night at the closing. When Ahern arrived, Miller told him there would be a lot of paperwork coming across the table and that he was to just sign each document and pass them along as quickly as possible. According to Miller, Ahern was at the January 13, 1988, closing for approximately one hour.

Several days later, after Miller and Phillips had obtained the checks from the closing, Miller again called Ahern and directed him to go to a bank in Noblesville. At the bank the checks were cashed and the money was all transferred to Phillips and Miller. Ahern did as he was told. According to Miller, Ahern did everything that he did in connection with this deal because he was Miller's friend and trusted him. Miller never er told Ahern that the real estate transfers were illegal. In fact, Miller told Ahern at some point in connection with these properties that the mortgage company had instructed them that this was the way to structure the "creative financing." Miller confirmed that when he would take documents to Ahern at his place of work to obtain his signature, he would tell Ahern to just sign the documents, and that everything is "okay."

Ahern was not entirely inexperienced in real estate matters. He was in the process of purchasing seven (7) rental houses from Frank Jackson on contract. Furthermore, Miller confirmed that as of January 1988, Ahern was still owed $30,000 to $40,000 and to that extent may have had a financial interest in the overall success of the Miller/Phillips real estate ventures, however, there is no evidence Ahern sought repayment on the loan. In fact, Miller testified that as of the date of the trial Ahern had not been repaid.

The indictment charged each of the defendants with conspiracy to violate 18 U.S.C. § 1010 and specifically charged Brian Ahern with violating 18 U.S.C. §§ 1010 and 2 for making statements "[o]n or about January 13, 1988," which "falsely indicated the payment of earnest money payments and cash closing costs in connection with loan closings for loans to purchase" the eight condominiums located at 43 and 51 West Fall Creek Parkway in Indianapolis, Indiana. Following a three day trial, the jury found Ahern guilty on all counts on which he was charged.

## SUFFICIENCY OF THE EVIDENCE

The Seventh Circuit has observed that, "[t]he offense set forth in [18 U.S.C.] § 1010 requires proof of three elements: the making of a false statement ... knowing it to be false, for the purpose of obtaining a loan from the lending institution and influencing the FHA." *United States v. Lovett*, 844 F.2d 487, 489 (7th Cir.1988), *quoting United States v. Leach*, 427 F.2d

1107, 1111 (1st Cir.), *cert. denied,* 400 U.S. 829, 91 S.Ct. 95, 27 L.Ed.2d 59 (1970). "To have had the intent required under § 1010 a defendant need not have thought that his [false application or other document] would be submitted to the FHA for insurance, as long as he thought it would be offered to the FHA for some purpose." *Lovett,* 844 F.2d at 490, *citing United States v. Maenza,* 475 F.2d 251, 253–54 (7th Cir.1973). Thus, in order to obtain a conviction of Brian Ahern on the eight counts charging a violation of § 1010 and 18 U.S.C. § 2 (the aiding and abetting statute)[4] the government was required to prove two aspects of Ahern's knowledge at the time he signed the settlement statements:

1. knowledge that the statements were false, and

2. knowledge that the statements "would be offered to the FHA [or HUD] for some purpose." *Lovett,* 844 F.2d at 490.

■ Knowledge or criminal intent is often exceedingly "difficult to demonstrate by direct proof," however, it may be inferred from circumstantial evidence. *United States v. Beck,* 615 F.2d 441, 447–48 (7th Cir.1980). In this case the government's evidence of Ahern's knowledge was entirely circumstantial. Indeed, the government's evidence consisted only of:

1. Ahern's supposed motive to help individuals who owed him a substantial sum of money,

2. the warnings contained on the HUD–1 settlement statements signed by Ahern, and

3. The circumstances of the transaction including: (a) testimony by William Miller that he had told Ahern that he needed Ahern to serve as the seller of property in a creative financing deal which would require no investment from Ahern, (b) prior similar dealings between Ahern and Miller, (c) Ahern's act of signing two letters confirming that he had received earnest money and (d) Ahern's acts of endorsing the earnest money checks and returning them to Miller, as well as his conduct in cashing the sales proceeds checks and permitting Miller and Phillips to take the cash.

■ The obligation of this court on defendant Ahern's motion for acquittal is to determine "whether at the time of the motion there was relevant evidence from which the jury could reasonably find [the defendant] guilty beyond a reasonable doubt, viewing the evidence in the light most favorable to the Government." *Beck,* 615 F.2d at 447. In *Beck* the Seventh Circuit set forth a "slightly more precise, but equivalent, test ... developed" in the Fifth Circuit:

> the test of the sufficiency of proof on a motion for judgment of acquittal or review of the denial of such a motion, is whether the jury might reasonably conclude that the evidence is inconsistent with the hypothesis of defendant's innocence.... Another way of expressing the same rule is that the motion for judgment of acquittal must be granted when the evidence, viewed in the light most favorable to the government, is so scant that the jury could only speculate as to the defendant's guilt, ... and is such that a reasonably-minded jury must have a reasonable doubt as to the defendant's guilt.

*Beck* 615 F.2d at 448 (citations omitted).

Ahern's defense to liability was that he acted in good faith without knowledge of the criminality of the fraudulent financing scheme and without knowledge that the forms he signed would be presented to HUD. Ahern's theory was supported by the testimony of the government's principal witness against him: William Miller. Miller testified that he relied upon Ahern's trust and relative ignorance about the real estate business to procure Ahern's assistance in the necessary transactions.

Miller stated that he told Ahern, the "minimum" about the financing scheme he, Bill Phillips and Barbara Pumphrey had devised. Furthermore, there was no evidence that Ahern could have or should

---

**4.** "The state of mind required for conviction as an aider and abettor is the same state of mind as required for the principal offense." *U.S. v. Valencia,* 907 F.2d 671, 680 (7th Cir.1990).

have ascertained the potential for HUD involvement in the project until he was given the HUD forms to sign at the January 13, 1988, meeting. In this regard, the evidence is uncontroverted that in the brief, chaotic and pressured meeting of January 13, 1988, Ahern did not read the documents, but merely signed them as directed and asked no questions. Finally, Brian Ahern's conduct following the January 13, 1988, closing did not reflect a consciousness of guilt.

■ "[G]ood faith" is "a complete defense to charges involving an intent to defraud." *United States v. Lewis*, 592 F.2d 1282, 1286 (5th Cir.1979). Accordingly, once Ahern produced some evidence in support of his good faith defense the government had the burden of proving beyond a reasonable doubt that Ahern lacked good faith "in order to sustain its burden of proving that [defendant] had the requisite intent." *United States v. West*, 666 F.2d 16, 19 (2d Cir.1981). This court concludes that, given the unique testimony and circumstances in this case, the government's snippets of evidence, taken together as they must be, cannot bear the weight of its burden of proof.

### 1. *Motive to Falsify*

■ The government urged that Mr. Ahern had a motive to take part in the illegal scheme because he was owed a substantial sum of money by Miller, Phillips and Wood. It has been said that a defendant's "stake or interest in the outcome of the perpetrators' crime" is "a factor appropriate for consideration on the issue of his guilt or innocence." *United States v. Aarons*, 718 F.2d 188, 192 (6th Cir.1983). Nevertheless, there was no testimony in this case that Ahern was told by any of the individuals who owed him money that repayment of the loan to him was linked to his help in obtaining creative financing. Nor was there testimony that Ahern needed money or had requested repayment.

Indeed, the evidence at trial indicated that Ahern had made the loan to his friend Miller with no strings attached and no time frame for repayment. Furthermore, even though the loans in question were approved, Miller testified that Ahern was never repaid. Thus, a direct link between Ahern's repayment and the fraudulent venture was not proved. At best it was established that Ahern had only a general interest in the overall business success of the individuals to whom he had loaned funds.

The evidence was, therefore, too attenuated for the jury to conclude that Ahern's actions were motivated by hope of financial reward. There simply was not any credible evidence that Ahern's desire to be paid was so intense or so immediate as to provide a motive to falsify documents. The government did not argue that Ahern was motivated by anything other than his alleged hope of financial reward.

### 2. *Warnings on Documents Signed by Ahern*

■ The government asked the jury to infer guilty knowledge from the fact that many of the documents signed by Ahern (and particularly the HUD–1 settlement statements) contained prominent warnings that knowingly signing a false statement was a federal crime. This court agrees that if the government had proved that Ahern read the warnings he would have had a duty of inquiry that might have permitted an inference that he knew the documents he signed were false. *See United States v. Ramsey*, 785 F.2d 184, 190 (7th Cir.1986) ("a person who has enough knowledge to prompt an investigation and then avoids further knowledge really does 'know' all that the law requires") *cert. denied, McCreary v. United States*, 476 U.S. 1186, 106 S.Ct. 2924, 91 L.Ed.2d 552 (1986).

Certainly the warnings, if read, conveyed to Ahern the fact that the signed documents were to be submitted to HUD. Such warnings have frequently been the basis for a finding that the defendant had the requisite criminal intent. *See, e.g., United States v. Lee*, 422 F.2d 1049, 1051 (5th Cir.1970) ("An FHA credit application, as was used here, prominently states on its face that it is submitted to obtain credit under Title I of the National Housing Act

and contains a warning that the making of a false statement or misrepresentation constitutes a federal crime. Where such an FHA form is used the jury may infer the existence of an intent that the loans should be sought from the Federal Housing Administration.... Thus, the fact that the loan applications were made on FHA forms provided sufficient evidence to support the jury's finding as to [the defendant's] intent."); *Terry v. United States*, 131 F.2d 40, 43 (8th Cir.1942); *see also United States v. Lange*, 528 F.2d 1280, 1289 n. 16 (5th Cir.1976) ("Had ... warnings been present, [defendant] would be held to a higher standard of care in signing the document"); *United States v. Maenza*, 475 F.2d 251, 254 (7th Cir.1973) (*quoting with approval Lee*, 422 F.2d at 1051).

Nevertheless, in each of the cases read by this court in which a warning was found to be evidence of a defendant's criminal knowledge there did not appear to have been uncontested and highly corroborated evidence that the defendant did not read the warning. Such evidence is present here.

The government called four witnesses to the January 13, 1988, meeting at which Ahern signed the documents containing the warnings. Each witness testified that there were hundreds of documents being handed around the room, that the atmosphere was rushed and chaotic, that no one was reading the documents because there was not time and that they did not observe Ahern reading the documents. Miller testified that he told Ahern to sign quickly because of the time pressure and the volume of paperwork to be done. Phillips could not recall any conversation with Ahern and did not observe him reading the documents. Barbara Pumphrey testified that she did not instruct anyone how to fill out the documents and did not recall anyone, including Ahern, reading them as they were shuffled around the room. In fact, Mrs. Curry testified that it was her duty as the loan closing officer to explain the transactions to those present but that she did not do so. Indeed, Mrs. Curry herself signed the documents in total reliance upon Barbara Pumphrey.

To prove a defendant violated § 1010, "[i]t is not sufficient to ... show that he signed a document with an untruthful statement which might tend to influence [HUD]. The burden on the government is to prove his knowledge of its falsity and his criminal intent ... to influence [HUD]." *C.I.T. Corp. v. United States*, 150 F.2d 85, 95 (9th Cir.1945). Guilty knowledge may not be inferred from Ahern's mere signatures on the HUD documents because there was substantial evidence he did not have the time to read the documents or the warnings at the January 13, 1988, closing and there was no evidence that he had any prior knowledge that he would be making representations that would go to HUD or that his representations were, in fact, false.

William Miller's undisputed testimony was that Ahern trusted him to the extent that Ahern did not read the paperwork for the creative financing project that Miller asked him to sign from time to time. Indeed, there was apparently little such paperwork to be signed prior to the January 13, 1988, closings. The only testimony at trial about such pre-closing paperwork focused on two earnest money deposit checks which Ahern endorsed and two letters which acknowledged that earnest money payments had been made to Ahern.

Although the two letters acknowledging the receipt of earnest money bear Ahern's signature, the undisputed testimony at trial was that these letters were drafted and typed by Barbara Pumphrey. Ahern merely affixed his signature at the bottom of the documents at the request of Miller. These letters contained no warnings of the type found on the settlement statements and thus could not have put Ahern on notice that they would be submitted to HUD even if Ahern had read the letters. Again, Miller testified that both letters were brought to Ahern at his place of business and that Ahern hastily signed them in reliance upon Miller.

3. *Knowledge of the Circumstances of the Real Estate Transactions*

■ There was no evidence at trial that Ahern was involved in the real estate busi-

ness of Miller, Phillips and Woods beyond the type of transactions at issue in this lawsuit. In particular, Ahern was not involved in the day to day operations of the business and had not invested in the business. Furthermore, while Ahern had previously participated in the purchase of several single family dwellings, there was no evidence he was familiar with commercial real estate transactions or condominium development or had ever applied for a HUD insured loan.

The real estate transactions engaged in by Ahern were described to him as "creative financing" in which the owners of the property (Miller, Phillips and Wood) would recover "their money" that they had put into the property in order to improve and rehabilitate the property.

Miller testified that Ahern had participated as the seller at similar closings in July and October of 1987. Apparently those real estate transactions were structured in the same manner as the deals closed on January 13, 1988, with Ahern signing documents as the nominal seller and returning earnest money deposits and the purchase price of the properties to Miller. What transpired at these prior transactions might have shed light on Ahern's knowledge at the time of the January 13, 1988, closing, however, by themselves, the mere fact that these closings took place prior does not give rise to an inference that Mr. Ahern had knowledge of the illegality of the scheme or that the settlement statements would be submitted to HUD. The mere fact that Ahern was involved in these transactions tells nothing about the knowledge Ahern did or did not gain from these prior experiences.

Indeed, even if Ahern had been a partner in Miller's real estate operation and had been involved in regular business operations of the real estate venture and even if this involvement would have caused a reasonable person to suspect that something was amiss, Ahern could not be convicted pursuant to 18 U.S.C. §§ 1010 or 2 absent additional evidence of Ahern's subjective knowledge of the fraudulent scheme. *See, e.g., United States v. Heithaus*, 391 F.2d

810, 811 (3d Cir.1968) (conviction under § 1010 reversed as to co-owner of business engaged in suspicious loan application business because there was no evidence that the defendant knew the information contained in loan application worksheets and no evidence that he "participated in the process of preparing loan applications"). In *United States v. Burns*, 683 F.2d 1056, 1061 (7th Cir.1982), *cert. denied*, 459 U.S. 1173, 103 S.Ct. 821, 74 L.Ed.2d 1018 (1983), the Seventh Circuit observed that, in general, a criminal defendant may not be considered to have guilty knowledge on the basis of a failure to inquire, absent "information which should require the defendant *himself* (and not a reasonable person) to investigate." (emphasis original; parenthetical original). This "calls for a subjective inquiry, rather than an objective one." *Id.*

■■ A defendant may be found to have the knowledge required to sustain a criminal conviction if he has a "lurking suspicion" of the criminality of his conduct but "goes on as before and avoids further knowledge." *Ramsey*, 785 F.2d at 189. In such a situation it may be inferred that the defendant "has deduced the truth and is simply trying to avoid giving the appearance (and incurring the consequences) of knowledge." *Id.* The focus, however, must always remain on the subjective knowledge of the individual defendant. The prosecution may not prevail by arguing that a reasonable person in the defendant's position would have been suspicious or would have investigated further. Instead, the prosecution must present "proof of intentional avoidance of knowledge." *Burns*, 683 F.2d at 1059.

Thus, Ahern's mere association with Miller may not lead to an inference that Ahern had criminal knowledge. Furthermore, the prosecution was required to confront the undisputed evidence of Ahern's exceptionally trusting and uninquisitive character with more than a description of a convoluted and arguably suspicious series of transactions. In *Heithaus* the court cautioned that although the circumstances are "suspicious ... suspicion falls short of proof beyond reasonable doubt." *Id.* Courts and

prosecutors (not to mention juries) must presume that "it takes a fairly large amount of knowledge to prompt further investigation ... to permit an inference of knowledge from just a little suspicion is to relieve the prosecution of its burden of showing every element of the case beyond a reasonable doubt." *Ramsey*, 785 F.2d at 190.

In fact, there was virtually no evidence regarding the circumstances of any real estate transactions Ahern may have participated in with Bill Miller or anyone else prior to the January 13, 1988, closings. There was no evidence, for example, that Ahern read the documents he was signing or that he had time to do so in any of the closings he attended. Furthermore, there was no evidence Ahern had the kind of knowledge of the real estate business that would have put him on notice that his conduct was illegal or that Ahern ever suspected that his conduct was illegal. The record is, therefore, bare of any evidence regarding the state of Ahern's subjective knowledge in January 1988. It is obvious that Ahern acted in an ill-advised and unwise manner in participating in the transactions at issue; nevertheless, § 1010 requires more than the level of ignorance proved by the government for criminal liability to attach.

Of course, if Ahern did not know that the statements he was making with respect to the real estate transactions were false he cannot be guilty of "knowingly" making false statements. In this regard Ahern's subjective knowledge is again paramount. The government contended at trial that Ahern falsely certified on the HUD–1 statement that he had received an earnest money deposit and that he would receive the specified proceeds from the sale of the property.

The testimony of Miller was uncontroverted that he did, in fact, present Ahern with a check for an earnest money deposit in the amount specified on the HUD–1 and that Ahern subsequently endorsed the check and returned it to Miller. Furthermore, the evidence was also uncontested that Ahern did, in fact, receive a check for the amount of proceeds specified on the HUD–1 and that he cashed this check and gave the cash to Miller. Thus, in a technical sense the amounts and transactions listed on the HUD–1 statement were accurate. The only relevant information not contained on the HUD–1 was that Ahern intended to immediately return all payments he received to Miller. This, of course, is extremely relevant information, but there is no evidence Ahern knew of the significance of the paybacks to the federal regulatory scheme or that the payments were prohibited by that scheme.

A reasonable inference is that, in the context of a relationship in which Ahern had regularly loaned his friend large sums of money, Ahern believed that he was entitled to give money he received from the sale of property he never purchased back to his friend. Moreover, the HUD–1 did not request the information that the government argues made the defendant's responses fraudulent. In this context, "the [g]overnment had the burden of negating the claim that the defendant 'did not know the falsity of his statement at the time it was made.'" *United States v. Steinhilber*, 484 F.2d 386, 389 (8th Cir.1973) *quoting Bryson v. United States*, 396 U.S. 64, 69–70, 90 S.Ct. 355, 358–359, 24 L.Ed.2d 264 (1969).

The government, however, did not negate the reasonable inference in Ahern's favor arising from the circumstances of these transactions: that is, that Ahern may have believed his statements were not fraudulent. The government cannot rely on the evidence of the circumstances surrounding the transactions in question to negate the inference in Ahern's favor since those same circumstances give rise to an equally compelling inference in Ahern's favor. Moreover, the government may not overcome this inference in Ahern's favor by pointing to warnings on the documents because a warning is unlikely to lead to further inquiry if an individual is convinced of the truthfulness of the statements he is attesting to. Finally, this court concludes that the paucity of evidence regarding Ahern's alleged motive to falsify is insufficient to outweigh the inference that Ahern

thought he was acting correctly. "[W]here the government's evidence is equally strong to infer innocence of the crime charged as it is to infer guilt, the verdict must be one of not guilty and the court has a duty to direct an acquittal." *Steinhilber*, 484 F.2d at 389 (citation omitted).

## CONSPIRACY

■ "The intent necessary to support a conviction for conspiracy is that the defendant intend 'to join and associate himself with [the] criminal design and purpose' of the conspiracy." *United States v. Gabriel*, 810 F.2d 627, 633–34 (7th Cir.1987), *quoting United States v. Herrera*, 757 F.2d 144, 149 (7th Cir.1985). As the Seventh Circuit noted in *Gabriel*, "this intent is 'more than knowledge, acquiescence, carelessness, indifference, lack of concern,' but rather is 'informed and interested cooperation, stimulation, instigation.'" *Gabriel*, 810 F.2d at 634 *quoting Direct Sales Co. v. United States*, 319 U.S. 703, 713, 63 S.Ct. 1265, 1270, 87 L.Ed. 1674 (1943).

In this case the government presented no evidence of defendant Ahern's knowledge of, or intent to, join the conspiracy other than the knowledge discussed above in relation to the substantive false statement charges against Ahern. Accordingly, because this court holds that Ahern's knowledge of the criminality of the real estate transactions was not proved, this court also finds insufficient proof to support the government's conspiracy count.

## DATE BY WHICH DEFENDANT MAY MAKE CONDITIONAL MOTION FOR NEW TRIAL

When a motion for judgment of acquittal is granted, Federal Rules of Criminal Procedure 29(d) requires this court to make a conditional ruling upon any motion for new trial pursuant to Federal Rules of Criminal Procedure 33 made by the defendant. This procedure promotes economy of judicial resources in that the question of whether a new trial should be granted, if raised, can be reviewed when the matter is fresh before the trial court. It also permits the appellate court to review a trial court's exercise of discretion on this subject if it is required to review the trial court's ruling granting a motion for judgment of acquittal, thus eliminating the need for multiple appeals.

As of the date of this entry, neither defendant Ahern nor defendant Mitchell has moved for a new trial. However, the time for filing such motions has not run. Federal Rules of Criminal Procedure 33 and 45(a) (A defendant has 7 days from the date of the verdict, excluding Saturdays, Sundays and holidays, to make such a motion). The court is authorized to enlarge the period for the filing of a motion for new trial. The court cannot know whether defendant Ahern intends to file such a motion, but if he does, it is more appropriate to defer entering the judgment of acquittal until after conditionally ruling on such a motion. Given the timing of the release of this entry and the intervention of a three-day weekend since trial, the court intends to allow defendant Ahern a brief enlargement of the time period in which he can file such a motion. Accordingly, Defendant Ahern will be given until the close of business on February 1, 1991 to file an alternate motion for a new trial pursuant to Fed.R.Crim.P. 33. The judgment of acquittal will not be ordered until after the court has had the opportunity to consider any issues raised in an alternate motion for a new trial, if any. Thus, the time for taking an appeal from the judgment of acquittal will not begin to run until after the issuance of the judgment.

The court is also authorized to enlarge the period for renewing a motion for judgment of acquittal. Rules of Criminal Procedure 29(c). Defendant Mitchell, although her motion for judgment of acquittal has already been denied, faces the same time frame for the filing of a renewal of her motion for judgment of acquittal and/or a motion for new trial. In order to keep the timing of matters concerning these two defendants on the same track, she will also be permitted until February 1, 1991 to file any such motions.

ALL OF WHICH IS ENTERED.