# IN THE SUPERIOR COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. THOMAS AND ST. JOHN

| | | |
|---|---|---|
| **PEOPLE OF THE VIRGIN ISLANDS,** | ) | CASE NO. ST-2019-CR-00217 |
| | ) | |
| Plaintiff, | ) | 14 V.I.C. §§ 921, 922(a)(1), 11(a) |
| vs. | ) | 14 V.I.C. §§ 921, 922(b), 11(a) |
| | ) | |
| **VIVIANE STUART a/k/a VIVIANE AIS,** | ) | |
| | ) | |
| Defendant. | ) | |

Cite as 2022 VI Super 93U

## MEMORANDUM OPINION & ORDER

¶1     **THIS MATTER** is before the Court on:

1.     Defendant Viviane Stuart's Motion For Judgment Not Withstanding The Verdict Or In The Alternative Motion For New Trial ("Motion"), filed August 31, 2022; and

2.     People Response To Motion For Judgment Not Withstanding The Verdict Or In The Alternative Motion For A New Trial, filed September 2, 2022.

¶2     The Court will deny the Motion as a reasonable juror could find the evidence sufficient to find the defendant guilty beyond a reasonable doubt and there is not a serious danger that an innocent person has been convicted.

## I.     INTRODUCTION

¶3     On June 22, 2005, Mr. Egbert "Manno" Stuart was found dead in the apartment he shared with his wife, Defendant Viviane Stuart, and their four (4)-year-old autistic son. Egbert Stuart's cause of death was multiple stab wounds and lacerations, with a twelve (12)-inch kitchen knife found protruding from his neck. On September 13, 2019, Stuart was arrested in connection with her husband's murder, joining her Co-defendant Jacques Cajuste ("Cajuste"), who had been arrested previously. Trial was delayed in March 2020, due to the Covid-19 pandemic. Stuart and Cajuste were then jointly tried, with jury selection beginning on August 1, 2022, and trial commencing on August 3, 2022. Trial proceeded for seven (7) days; closing arguments and jury instructions were given on August 11, 2022, and the jury began deliberating at 2:30 pm. The jury reached a verdict at 4:58 pm and found Cajuste and Stuart both guilty of First Degree Murder – Aiding and Abetting in violation of VI. CODE ANN. tit. 14, §§ 11, 922.

### A. Stuart's Arguments

¶4    Stuart moves for a judgment notwithstanding the verdict pursuant to Virgin Islands Rule of Criminal Procedure 29(c) or, in the alternative, for a new trial pursuant to Virgin Islands Rule of Criminal Procedure Rule 33. Stuart asserts that "the evidence presented to the jury was insufficient to prove beyond a reasonable doubt that she committed first degree murder or aided and abetted anyone in the killing of Egbert Stuart" and that "the comments made in the Prosecutor's closing arguments were prejudicial and denied her a fair trial."[1] Alternatively, Stuart requests a new trial because of "improper/prejudicial comments made by the People in closing arguments, the People's improper vouching for witnesses in closing arguments, and new evidence adduced at trial, through the testimony of several of the witnesses, that were not available to the Defense prior to the trial."[2]

¶5    Stuart argues that "none of the facts outlined by the Court, as adduced at trial, provide substantial evidence to support a conviction for first degree murder and/or aiding and abetting first degree murder."[3] Stuart states that "none of the witnesses placed Defendant Stuart at the scene of the killing of Egbert Stuart."[4] Further, Stuart argues that the time of the killing was based on an estimation of an expert who estimated the time using the observations noted by police officers who saw the body at the scene of the murder; and that a testifying officer did not attest to any training that qualified him to make the observation that the "body was in full rigor."[5]

¶6    Stuart also claims the testimony of Mr. Lemuel Houston, Jr. ("Houston") was contradictory because he stated on June 22, 2005 that he heard "a lot of noise" that "sounded like there was a fight/struggle and it sounded like something/someone being moved on the floor" and then he later woke up and there was an ambulance and police.[6] Stuart then says that the testimony adduced at trial contradicts this because Houston testified he heard noise the evening of June 21, 2005 and then heard noise early in the morning of June 22, 2005, and also at no point did he testify that Stuart was at the scene.[7]

¶7    Next, Stuart contends that there "was insufficient evidence adduced at trial, to support a finding that Viviane Stuart aided and abetted anyone in the murder of Egbert Stuart."[8] Stuart argues that "[n]one of the witnesses testified to any specific action or set of actions by Ms. Stuart that showed she knew of the crime or attempted to facilitate it."[9] Stuart claims that the testimony showed that Stuart went to get gas on the evening of June 21, 2005 at two (2) gas stations she

---

[1] Def.'s Mot. 1.
[2] Def.'s Mot. 2.
[3] Def.'s Mot. 2.
[4] Def.'s Mot. 3.
[5] Def.'s Mot. 3.
[6] Def.'s Mot. 4.
[7] Def.'s Mot. 4.
[8] Def.'s Mot. 6.
[9] Def.'s Mot. 6.

frequents but did not end up getting gas, going instead on the morning of June 22, 2005.[10] Stuart states that "[t]he People asked the jury to infer, without direct or circumstantial evidence, that Ms. Stuart went to Polyberg Hill instead of going to obtain gas as she stated in her interview" and that this inference is impermissible.[11]

¶8     Stuart additionally states Virgin Islands Police Department ("VIPD") officers testified that there was no forced entry and there were only two (2) keys to the apartment, but that there was "no testimony that Ms. Stuart's keys were missing or that her key was tested for other DNA."[12] Further, she says that Ms. Lisa Toussaint ("Toussaint") "testified that Ms. Stuart arrived to work late, took the sign in book, that she did not stay with her in at her post, that Ms. Toussaint called for her on the radio and never saw her again that evening." Stuart insists that this is direct contravention to her written police statement taken June 29, 2005, when Toussaint says "shortly after she took off from the lobby, she call me over the radio to open the lobby for some guests, she was by the door standing. . . . When she call me it was twenty to twenty five minutes after she had leave the lobby."[13] Stuart states this was a "lie on the stand" meant to get the jury to speculate that Stuart was not at her job.[14] Finally, Stuart argues that the testimony of Ms. Valerie Daley ("Daley") regarding the insurance proceed claim is insufficient as Stuart could have also been seeking to acquire it for funeral expenses.[15]

¶9     Stuart argues that this evidence is simply inference after inference, that a verdict must not rely on mere speculation, but there must be substantial evidence tying Stuart to the crime, and that burden is not met here.[16] Stuart cites to the Virgin Islands Supreme Court case of *People v. Clarke*,[17] where the Virgin Islands Supreme Court found that a witness seeing a man, Clarke, drive another man who ran across the street with a gun away from a crime scene was not sufficient evidence to show that Clarke knew that the other man had a firearm or intended to use it for a crime. Stuart argues that the People presented no evidence to show that Stuart knew where her Co-defendant Cajuste lived, that there was a knife in that home, or that the knife would be used in a murder, nor did they present any evidence that "Stuart aided, abetted, counseled, commanded, induced or procured the commission of any weapon (including this knife) to facilitate the murder or aid and abet the murder of Egbert Stuart."[18]

¶10     Stuart also contends that there was no evidence of a plan to kill Egbert Stuart and that the People did not "provide any evidence of Ms. Stuart's knowledge of a plan or how she associated with the venture."[19] Stuart argues there was no evidence of any affirmative steps to further the

[10] Def.'s Mot. 6.
[11] Def.'s Mot. 6.
[12] Def.'s Mot. 6.
[13] Def.'s Mot. 6-7.
[14] Def.'s Mot. 7.
[15] Def.'s Mot. 7.
[16] Def.'s Mot. 7.
[17] 55 V.I. 473 (V.I. 2011).
[18] Def.'s Mot. 8-9.
[19] Def.'s Mot. 9.

*People of the Virgin Islands v. Viviane Stuart a/k/a Viviane Ais*
Case No. ST-2019-CR-00217
Memorandum Opinion and Order
Page 4 of 17

2022 VI Super 93U

specific intent of killing Egbert Stuart.[20] Further, Stuart argues that the "record was completely silent that she gave her key to anyone" and that the "People wanted the jury to infer that she must have given her key to someone" but there was no evidence supporting this fact.[21] Stuart argues that no reasonable jury could find she aided and abetted in the murder of Egbert Stuart because the inferences are too tenuous and are mere speculation.[22]

¶11    Stuart next moves for a new trial, arguing that due to "prosecutorial misconduct, she was prejudiced, unable to offer an effective cross examination of witnesses, and thus, she is entitled to a new trial."[23] Stuart states that during the trial, Toussaint was the only person to testify that Stuart and Cajuste knew each other, and she testified to facts not previously in her police statement, namely that Cajuste called Stuart on two (2) occasions the night of the murder and that he would visit Stuart on the job site.[24] Stuart states these statements were completely new, not provided during discovery, and unknown to Stuart and that these statements led the prosecutor to impermissibly state at closing that Cajuste was Stuart's boyfriend.[25]

¶12    Stuart argues that the Court did not issue any curative instruction here, but rather stated that the statement made by counsel was not in evidence, and that the People reiterated the "narrative" that Cajuste called and visited Stuart several times.[26] Stuart also argues that the prosecutor's statement questioning why would the witness travel all the way to the territory just to lie constituted improper vouching of the credibility of the witness.[27] Stuart cites to *Farrington v. People*[28] for the assertion that it is improper for a prosecutor to vouch for a witness.[29]

¶13    Lastly, Stuart asserts that during sidebar after Toussaint's cross-examination, the People revealed entirely new recollections "shared by Ms. Toussaint."[30] Namely, Stuart states that the "People revealed that Ms. Toussaint allegedly stated that on the early morning of June 22, 2005 around 2:00 am, she saw on the camera, Ms. Stuart leave the hotel in her vehicle."[31] Stuart states she asserted spoliation of evidence as a reason to dismiss the Information because VIPD officer Detective Delbert Phipps ("Phipps") did not "provide a time frame for video surveillance from the hotel, thus he did not preserve exculpatory evidence in 2005" and that Phipps testified he did so because of where the vehicle was located, it would not have been visible on the video.[32] Stuart

---

[20] Def.'s Mot. 9.
[21] Def.'s Mot. 9.
[22] Def.'s Mot. 9-10.
[23] Def.'s Mot. 11.
[24] Def.'s Mot. 11.
[25] Def.'s Mot. 11.
[26] Def.'s Mot. 12.
[27] Def.'s Mot. 12-13.
[28] 55 V.I. 644 (V.I. 2011).
[29] Def.'s Mot. 13.
[30] Def.'s Mot. 13.
[31] Def.'s Mot. 13.
[32] Def.'s Mot. 13.

states this is in direct contradiction to information Toussaint provided to the People and if the video had been retrieved it would have proved her innocence.[33]

¶14    Stuart states that a week after Egbert Stuart's death, "homicide detectives made contact with the manager of the Emerald Beach Hotel regarding surveillance cameras on the property" and that they were "advised to provide a time frame in order to conduct a search to see if anything came up on the video."[34] Stuart also says she requested footage from the two (2) gas stations she reportedly visited, although it was not produced.[35] Stuart argues that she believes "the police never reviewed the tapes; never took steps to preserve them; and in the intervening seventeen (17) years, any tapes are long since lost, destroyed or not salvageable."[36] Further, she states that the People rely on the testimony of Stuart's coworker instead of the surveillance footage that Phipps "failed to secure and preserve."[37]

¶15    Stuart argues that the videotape would have been exculpatory because it would have directly contradicted Toussaint's testimony that she saw when Stuart left her work.[38] Stuart argues it is known from the testimony of Toussaint that the video would have picked up her vehicle leaving, and that the police failed by making an inquiry as to the tapes and not preserving them. Stuart also states that she has "now learned that the camera picked up vehicle movement."[39] Stuart also says that Toussaint's testimony that she saw Stuart leave on the tapes directly contradicts Phipps' statement and investigation into the surveillance tapes and that this would-be exculpatory alibi evidence warrants a new trial.[40]

### B. People's Response

¶16    The People request that Stuart's Motion be denied. The People first summarize the evidence presented at trial: there was no sign of a break-in to the apartment where Egbert Stuart was found; no way to enter except through the double-locked door which Stuart stated she locked before work; only Stuart and the decedent had keys and the decedent's keys were still inside; Detective Phipps described Stuart as not emotionally distraught and calmly talking on the phone the morning of the murder; photos of Stuart on the scene show her relaxed; police had to order Stuart to stop talking on the phone to give an interview; a neighbor heard Stuart state "Yeah girl, Manno dead;"[41] at no point up until her arrest in 2016 did Stuart ever inquire about the progress of the investigation or if her husband's killer was caught; DNA analysis placed Cajuste's blood and DNA at the scene of the crime; Stuart's coworker testified the night of the murder Stuart arrived late at 12:30 am and took the log-in book with her, which was not procedure; that the only

---

[33] Def.'s Mot. 13.
[34] Def.'s Mot. 14.
[35] Def.'s Mot. 14.
[36] Def.'s Mot. 14.
[37] Def.'s Mot. 14.
[38] Def.'s Mot. 16.
[39] Def.'s Mot. 17.
[40] Def.'s Mot. 17.
[41] Testimony at trial indicated the decedent Egbert Stuart's nickname was "Manno."

time someone else verified Stuart was at work at between 1:00 am and 1:15 am when her supervisor verified she was at work; Stuart gave conflicting stories as to when she got to work, where she was at before work, and what she was doing; a VIPD investigation found Stuart's story to be incorrect and Stuart later indicated that she was in the area of Cajuste's residence; Stuart left work the morning of the murder, later than usual; witnesses placed the murder weapon as being from the residence Cajuste stayed at, it was seen in his room, and not seen again after the murder; Cajuste visited the hospital the day after the murder for a cut on his arm; Cajuste seemed nervous when interviewed by police and fled the island shortly after; Stuart was a life insurance beneficiary of Egbert Stuart and she made a life insurance claim shortly after the death; and Egbert Stuart was in rigor mortis when discovered by the police.[42]

¶17    The People argue that they "sustained their burden at a jury trial" and "the facts presented . . . showed that defendant Stuart aided and abetted defendant Cajuste in the murder of Egbert Stuart."[43] The People state that "[a]lthough counsel argues credibility of the witnesses who testified, this is an improper argument" as the Court is prohibited from weighing the evidence and the credibility of witness testimony.[44] The People cite to *People v. Morton*[45] for the tenet that "'[o]nly when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt,' may the court overturn the jury's verdict."[46] The People contend that the "facts outlined above show that not only could a reasonable juror find the defendant guilty, but in fact twelve jurors did find the defendant guilty" and therefore the Court should deny Stuart's Motion.[47]

## II.    LEGAL STANDARD

### A. Motion For Judgment of Acquittal

¶18    Virgin Islands Rule of Criminal Procedure 29(c)(1) gives a defendant fourteen (14) days after a guilty verdict to file for acquittal.[48] Rule 29(c)(2) allows the Court to set aside a guilty verdict and enter an acquittal.[49] "When a defendant challenges the sufficiency of the evidence presented at trial, we must view the evidence in the light most favorable to the People, and affirm the conviction if 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"[50] The standard of review for a judgment of acquittal is highly

---

[42] People's Resp. 1-3.

[43] People's Resp. 4.

[44] People's Resp. 4.

[45] 57 V.I. 72 (V.I. Super. Ct. 2012).

[46] *Id.* at 76 (quoting *United States v. McNeill*, 887 F.2d 448, 450 (3d Cir. 1990)).

[47] People's Resp. 5.

[48] V.I. R. CRIM. P. 29(c)(1) ("Unless otherwise extended by the court, a defendant may move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later.").

[49] V.I. R. CRIM. P. 29(c)(2) ("If the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal. If the jury has failed to return a verdict, the court may enter a judgment of acquittal.").

[50] *Williams v. People*, 56 V.I. 821, 826-27 (V.I. 2012) (quoting *Mendoza v. People*, 55 V.I. 660, 667 (V.I. 2011), *cert. denied*, No. 12-1255, slip op. at 1 (3d Cir. May 4, 2012)).

deferential as the Court "must be ever vigilant . . . not to usurp the role of the jury."[51] Therefore, the Court does not weigh evidence or determine the credibility of witnesses.[52] "Accordingly, a finding of insufficiency should be 'confined to cases where the prosecution's failure is clear' and '[o]nly when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt,' may the court overturn the jury's verdict."[53]

## B. Motion For New Trial

¶19    Virgin Islands Rule of Criminal Procedure 33(a) allows a defendant to make a motion for a new trial and the "court may vacate any judgment and grant a new trial if the interest of justice so requires."[54] Rule 33(b)(2) gives a defendant fourteen (14) days from a verdict or finding of guilty within which to make this motion.[55] Whether or not to grant a new trial "is squarely within the Court's sound discretion;" however, motions for new trials are largely not favored and they should not be granted "unless there is a serious danger that an innocent person has been convicted."[56]

## C. Due Process Claim; spoliation

¶20    "In criminal proceedings, the People have an obligation to preserve evidence that may be 'expected to play a significant role in the suspect's defense'" and the failure to preserve this evidence may "constitute a violation of an accused's rights to Due Process."[57] "In order to prevail on a due process claim, 'a defendant must prove that the government acted in bad faith when it failed to preserve the evidence.'"[58] The Court must consider "whether the exculpatory value of the evidence was apparent at the time it was lost or destroyed" in order to determine whether the government acted in bad faith.[59] A defendant must prove more than that the government was simply negligent in its duty to preserve evidence or that the police did not follow normal procedures.[60]

---

[51] *Morton*, 57 V.I. at 76 (quoting *United States v. Boria*, 592 F.3d 476, 480 (3d Cir. 2010)).

[52] *Smith v. People*, 51 V.I. 396, 401 (V.I. 2009) (citing *United States v. Carr*, 25 F.3d 1194, 1201 (3d Cir. 1994)).

[53] *Morton*, 57 V.I. at 76 (first quoting *United States v. Leon*, 739 F.2d 885, 891 (3d Cir. 1984); and then quoting *United States v. McNeill*, 887 F.2d 448, 450 (3d Cir. 1990)).

[54] V.I. R. CRIM. P. 33(a) ("Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires. If the case was tried without a jury, the court may take additional testimony and enter a new judgment.").

[55] V.I. R. CRIM. P. 33(b)(2) ("Any motion for a new trial grounded on any reason other than newly discovered evidence must be filed within 14 days after the verdict or finding of guilty, or within such further time as the court may fix.").

[56] *Morton*, 57 V.I. at 76 (first quoting *United States v. Petersen*, Crim. No. 2006-29, U.S. Dist. LEXIS 2863, at *6 (D.V.I. 2009); then citing *Gov't of the Virgin Islands v. Derricks*, 810 F.2d 50, 55 (3d Cir. 1987); and lastly quoting *Stevens v. People*, 52 V.I. 294, 306 (V.I. 2009)).

[57] *People v. Smith*, No. ST-2010-CR-00217, No. ST-2010-CR-00216, 2011 V.I. LEXIS 20, at *5 (V.I. Super. Ct. March 23, 2011) (quoting *California v. Trombetta*, 467 U.S. 479, 488 (1984)).

[58] *People v. Sealey*, No. SX-2011-CR-00883, 2014 V.I. LEXIS 75, at *3 (V.I. Super. Ct. Sept. 15, 2014) (quoting *U.S. v. Deaner*, 1 F.3d 192, 200 (3d Cir. 1993)).

[59] *Id.* (quoting *Smith*, 2011 V.I. LEXIS 20, at *4).

[60] *Id.* (citing *Smith*, 2011 V.I. LEXIS 20 at *4).

*People of the Virgin Islands v. Viviane Stuart a/k/a Viviane Ais*
Case No. ST-2019-CR-00217
Memorandum Opinion and Order
Page 8 of 17

2022 VI Super 93U

## III. ANALYSIS

¶21    As a preliminary matter, Stuart's motion was timely filed. Both Stuart's request for an acquittal notwithstanding the jury verdict and request for a new trial will be denied for the reasons outlined below.

### A. The evidence was sufficient to convict Stuart and an acquittal is not appropriate in this case

¶22    Stuart argues that evidence is insufficient to support her conviction by pointing to several supposed deficiencies, such as no witness saw or placed Stuart at the crime scene, her keys were not tested for DNA, and there was no direct evidence that she knew about or helped acquire the murder weapon. However, the Court does not weigh the evidence or the strength of specific facts: "[t]he measure of reasonable doubt need not be applied to specific detailed facts but only to the ultimate issue."[61] Rather, it is enough that there were circumstances from which a reasonable juror could infer the elements necessary for the crime convicted: "[s]o long as the totality of circumstantial evidence relating to [an element of the crime] would enable a reasonable factfinder to infer such [element] beyond a reasonable doubt, the due process requirement for sufficiency of the evidence on that element of the offense is satisfied."[62]

¶23    Stuart also argues that certain witnesses were not credible, such as the testimony given by Toussaint, Phipps, or Dr. Francisco Landron ("Landron"). Particularly as to Landron and Phipps' testimony, Stuart argues that there was insufficient evidence to establish precisely at what time Egbert Stuart was killed. Stuart also alleges that Houston gave inconsistent testimony. The Court, however, does not determine the credibility of witnesses. Stuart was also given the opportunity to cross-examine the witnesses on any perceived inconsistency, and she did so through counsel.[63]

¶24    Stuart was found guilty of First Degree Murder – Aiding and Abetting in violation of 14 V.I.C. §§ 11, 922.[64] "Establishing the offense of aiding and abetting requires the People to prove (1) that the substantive crime has been committed, and (2) the defendant knew of the crime and attempted to facilitate it."[65] Additionally, "the People must prove that the 'defendant associated himself with the venture, that he participated in it as something he wished to bring about, and that he sought by his words or action to make it succeed.'"[66] While Stuart argues that her verdict rests upon inferences drawn from inferences drawn from inferences, the evidence does not show a chain of inferences but rather a collection of direct and circumstantial evidence from which Stuart's guilt

---

[61] *Gov't of the V.I. v. Greene*, 708 F.2d 113, 115 (3d Cir. 1983).

[62] *Id.* at 115-16.

[63] *See, e.g.*, Trial Tr. II; 180-81 (Aug. 4, 2022 Cross-examination of Lemuel Houston, Jr.).

[64] 14 V.I.C. 11(a) ("Whoever commits a crime or offense or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."); 14 V.I.C. § 922(a)(1) ("(a) All murder which— (1) is perpetrated by means of poison, lying in wait, torture, detonation of a bomb or by any other kind of willful, deliberate and premeditated killing . . . is murder in the first degree.").

[65] *Clarke*, 55 V.I. at 479 (citing *Brown v. People*, 54 V.I. 496, 500 (V.I. 2010)).

[66] *Id.* (quoting *Nanton v. People*, 52 V.I. 466, 484 (V.I. 2009)).

*People of the Virgin Islands v. Viviane Stuart a/k/a Viviane Ais*
Case No. ST-2019-CR-00217
Memorandum Opinion and Order
Page 9 of 17

2022 VI Super 93U

can be inferred like wheel-spokes pointing to a hub, and the totality of which could certainly form the basis of a reasonable juror's finding of guilt.

¶25    Egbert Stuart had slash and stab marks all over his body, defensive wounds, he was found in his room lying on the floor in his boxers with the mattress partly over him, and a knife was sticking through his neck. Further, his downstairs neighbor was awoken during the night by loud banging and what sounded like a struggle. Although no one saw Egbert Stuart get killed or the perpetrator, a reasonable juror could certainly find from this evidence that Egbert Stuart was killed and the substantive crime of First Degree Murder was committed. There is no requirement that Egbert Stuart's exact time of death be established, and there was certainly ample evidence to show that he was murdered sometime between the night and early morning of June 22, 2005.

¶26    Egbert Stuart was murdered with a knife that looked just like one seen in Cajuste's room, which was not seen in the house again, and Cajuste's blood and DNA was found at the murder scene. Cajuste was treated at a hospital for a knife wound the day after the murder, he gave a conflicting account to police about when he had suffered the wound and he seemed nervous when interviewed by police about the murder. Cajuste then promptly left the island for the mainland and did not return until his arrest. A reasonable juror could certainly believe that Cajuste was the murderer based on this evidence.

¶27    Likewise, the decedent was killed inside Stuart's apartment, with no sign of forced entry or burglary, with the door having been locked by Stuart and with her having the only other set of keys. The night of the murder, Stuart arrived late to work as a security guard at a resort and left the lobby where she usually stayed and took the hourly logbook with her, with only one of the hourly entries confirmed by a supervisor who checked in once at 1:00 am. The resort's night auditor, Toussaint, also testified she made a call from the front desk to security and did not receive an answer from Stuart. She also testified that Cajuste would come frequently when he was not working himself to visit with Stuart. Toussaint also testified that Cajuste twice called for Stuart and spoke with her twice the night of the murder.

¶28    Stuart's explanation to police as to what she was doing the night of the murder before work changed. First, she said that the gas station near her work was out of gas, which an officer confirmed the following day it was not. Later, Stuart said that she drove to a gas station located near Cajuste's residence, passing other gas stations in the process, only to turn around from there as she stated there was a long line of cars waiting to get gas at midnight there, even though no storm was coming. The police and a neighbor testified that Stuart did not seem distressed or upset upon returning home to find her husband gruesomely murdered, but instead she was chatting on a phone and drinking juice, when a neighbor heard her state "yeah girl, Manno dead." Further, a VIPD detective had to order Stuart to hang up the phone and talk with them. Stuart also made a claim on Egbert Stuart's life insurance policy soon after the murder.

¶29    Moreover, Stuart never inquired with VIPD as to whether her husband's killer was found or how the investigation was going. From these circumstances, a reasonable juror could certainly

conclude that Stuart knew of the intended murder of her husband and aided, induced, or otherwise procured the commission of the murder of her husband by Cajuste by aiding him the night of the murder in accessing her apartment. Viewing these circumstances in a light most favorable to the People, the Court concludes that acquittal is not appropriate in the instant case.

¶30    While Stuart argues this case in analogous to *Clarke*, the Court is not so persuaded. In *Clarke*, the Virgin Islands Supreme Court found that there was "insufficient evidence to convict Clarke of aiding and abetting in the unauthorized possession of a firearm during the commission of a crime of violence."[67] In that case, an eyewitness saw a man running from the location where a body was discovered cross the street while tucking away a gun.[68] The assailant entered into a car and the eyewitness identified Clarke as the driver.[69] The Virgin Islands Supreme Court found this sole evidence insufficient as "there is nothing in the record to suggest that Clarke knew that [the assailant] possessed a gun or that she participated in the shooting of Fritz."[70]

¶31    Conversely, in the instant case there are multiple pieces of evidence that suggest that Stuart was aware of Egbert Stuart's planned murder and aided in it, including: her late arrival to work, the self-confessed trip to the area of Cajuste's residence before work, and her unusual behavior in taking the logbook and leaving the lobby at her work the night of the murder; the several calls with Cajuste the night of the murder; her reportedly calm demeanor the morning of the murder shortly after returning home to the body; her lack of interest in the investigation both the morning of the murder and at any time afterward; her prompt claim for life insurance proceeds; as well as the fact her locked apartment was not broken into or burglarized and she had the only other set of keys, with Egbert Stuart's keys having been found undisturbed in the apartment. The totality of the evidence here is clearly weightier than a single eyewitness seeing an individual enter a car and strongly suggests at the very least prior knowledge of the murder plot, as opposed to the situation in *Clarke* where someone was picking up a person without any suggestion that they knew or should know what that person was doing beforehand or what they have on their person.

### B.  A new trial is not warranted in this case

¶32    Incorporating the facts and evidence reviewed above, the Court also does not consider a new trial is warranted in this case as there does not appear to be a serious danger that an innocent person was convicted nor was there a Due Process violation.

### 1.  The People's characterization of Cajuste and Stuart's relationship is not highly prejudicial

¶33    Stuart requests a new trial because of Toussaint's testimony and the People's subsequent statement in closing arguments that Cajuste was Stuart's "boyfriend." While Stuart argues that

---

[67] *Clarke*, 55 V.I. at 474.

[68] *Id.* at 475.

[69] *Id.*

[70] *Id.* at 478.

Toussaint testified to facts not previously in her police statement, there is no requirement that witnesses only testify to what they were asked by police. Indeed, as an investigation progresses and more information is unearthed, it is not unusual for a witness to have additional relevant information apart from what investigators thought might be relevant at the time they took a statement. Stuart was allowed to, and did through counsel, cross-examine Toussaint; and she could, and did, question her about her police statement.[71]

¶34 Stuart then argues that Toussaint's statements—that she was familiar with Cajuste as he would call Stuart and visit with Stuart in his free time and while she was working—led the prosecutor to state that Cajuste was Stuart's boyfriend and that this was impermissible. Stuart further argues that the Court erred by not issuing any curative instruction and by instead stating that the statement was not in evidence, and that the People then reiterating Toussaint's "narrative" that Cajuste called and visited Stuart several times was also improper. Stuart cites to the framework in *Augustine v. People*[72] to urge the Court to find the People's statement to be prejudicial: "(1) whether [the witness's] remarks were pronounced and persistent, creating a likelihood they would mislead and prejudice the jury; (2) the strength of the other evidence; and (3) curative action taken by the [trial] court."[73]

¶35 The People's statement that Cajuste was Stuart's boyfriend was a one-time characterization of the relationship between Cajuste and Stuart which was promptly objected to, and that objection was sustained. The People then withdrew that characterization and recharacterized the relationship in a less succinct fashion, but one more in tune with Toussaint's testimony, describing Cajuste as "the man that calls [Stuart] several times at night . . . the man that comes to visit [Stuart] while she's working when he is not working."[74] This statement, or "narrative" as Stuart refers to it, was supported by the testimony of Stuart's coworker.

¶36 The People's initial characterization was not wildly inappropriate or even inconsistent with the testimony, as the recharacterization highlights. There was no other evidence which contradicted Toussaint's testimony, and there was other evidence that Cajuste did work at the same place as Stuart. The initial characterization was promptly objected to and withdrawn in front of the jury and the People's closing argument continued. The Court believes the swift objection by Stuart's counsel and subsequent more precise framing by the People was an adequate solution, and any curative instruction would have in fact exacerbated, not cured, any potential prejudice by refocusing the jury on the initial brief characterization, as opposed to the subsequent recharacterization.[75] Therefore, the Court does not find any potential prejudice suffered by Stuart by this brief characterization to be so highly prejudicial as to warrant a new trial.

---

[71] Trial Tr. II; 212-14 (Aug. 4, 2022 Testimony of Lisa Toussaint).

[72] 55 V.I. 678 (V.I. 2011).

[73] *Id.* at 686 (brackets in original).

[74] Trial Tr. VII; 90, ll. 13-16 (Aug. 11, 2022 People's Closing Argument).

[75] *See* Jeffrey M. Pollock, *Jury Instructions Are Critically Important*, N.J.L.J. (Jun. 26, 2017, 3:11 PM), https://www.foxrothschild.com/publications/jury-instructions-are-critically-important:

If the court grants the curative instruction, now the jury will hear the same bad facts, albeit in

*People of the Virgin Islands v. Viviane Stuart a/k/a Viviane Ais*
Case No. ST-2019-CR-00217
Memorandum Opinion and Order
Page 12 of 17

2022 VI Super 93U

### 2. The People did not impermissibly vouch for the credibility of a witness and therefore a new trial on those grounds is not proper

¶37    Stuart also argues a new trial is warranted because the People impermissibly vouched for the credibility of a witness. The Virgin Islands Supreme Court stated in *Farrington* the proposition that an attorney may not vouch for the credibility of a witness: "Courts have held that it is improper for an attorney to vouch for the credibility of a witness."[76] The Virgin Islands Supreme Court highlighted two primary concerns: "(1) such comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury; and (2) the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence."[77] However in this case, the People did not impermissibly vouch for the credibility of the witness because they did not insinuate they knew the witness was telling the truth for reasons outside of the evidence.

¶38    In the instant case, the People stated at closing:

> And I submit to you, Lisa Toussaint doesn't have any reason to lie. Lisa Toussaint lives in New York. Lisa Toussaint is 17 years removed from this case and doesn't live in St. Thomas. Are we to believe that she came down here from New York just to lie, or is it more reasonable that she came down here because she remembers what occurred that night and why it struck her as strange?[78]

¶39    In *Farrington*, the prosecutor stated of a witness: "[w]hy would Trevorn Lake want to make up a story?"[79] The Virgin Islands Supreme Court stated that this statement "does not constitute vouching. There was no insinuation that the prosecutor, for some reason outside of the evidence, knew that Trevorn was telling the truth."[80] Likewise, in the Third Circuit case of *United States v. Walker*,[81] the Third Circuit considered whether this statement constituted improper vouching:

> Now, ask yourselves what motivation would Officer Robert Scott and former Officer Raymond Dubois have to come in here and lie to you. What motivation.

---

the context of an instruction to disregard what the jurors just heard, twice (once when it was stated and once when the judge reminded the jurors of the bad statement and effectively says: "Now that bad statement I just reminded you about, you are to disregard it."). In short, is the curative instruction antidote worse than the poisonous statement?

[76] *Farrington*, 55 V.I. at 656 (citing first *United States v. Francis*, 170 F.3d 546, 550 (6th Cir. 1999); then citing *United States v. Roberts*, 618 F.2d 530, 533 (9th Cir. 1980)).

[77] *Id.* at 657.

[78] Trial Tr. VII; 90, ll. 23-25; 91, ll. 1-8 (Aug. 11, 2022 People's Closing Argument).

[79] *Farrington*, 55 V.I. at 656.

[80] *Id.* at 657.

[81] 155 F.3d 180 (3d Cir. 1998).

> I submit to you that they have no motivation to lie to you. I submit to you that you can determine, using your common sense and your judgment, you can determine the credibility of those two and the only two eyewitnesses to the search . . .[82]

¶40     The Third Circuit held that the prosecutor's questions of "what motivation . . ." did not constitute vouching as the question "does not maintain the credibility of the two witnesses by referring to information outside the record, nor does it contain a personal assurance of veracity" and within its context, "the statement merely points to the fact that Walker did not produce any evidence indicating a motive on the part of the law enforcement officers to lie."[83] The prosecutor's statements beginning with "I submit to you" did not constitute vouching "because it does not assure the jury that the witness is credible, but instead asks the jury to find that the witness was credible" and this constitutes a "proper argument."[84]

¶41     Likewise here, the People were not assuring the jury that the witness, Toussaint, was credible or that the People had some inside knowledge not in evidence for why the jury should consider Toussaint credible. Rather, here the People were providing an argument for why the jury might find her credible—the night was so unusual it stuck in her head. Additionally, the People also pointed out that the Defendants had not provided any argument for why Toussaint should be considered a liar or what motivation there was for Toussaint to lie—traveling from New York to St. Thomas years later just to commit perjury does not make much sense. By framing these remarks as a question, and by using the phrase "I submit to you," the People are leaving the determination of the witnesses' credibility up to the jury. This kind of argument and question, as in *Farrington* and *Walker* above, are proper for the People to make and do not constitute improper vouching. Therefore, the Court will not order a new trial based on the grounds of improper vouching as urged by Stuart.

### 3.  The Court will not order a new trial based on the nonexistence of security tapes

¶42     Lastly, Stuart argues that the People shared recollections of Toussaint at sidebar, namely that Toussaint saw Stuart leave the hotel the night of the murder in her vehicle at 2:00 am, which contradicts Phipps' testimony that he did not pull video footage from Stuart's place of employment during the investigation because the vehicle would not have been visible on it given where the vehicle was parked. Stuart argues that this surveillance video was exculpatory evidence that was kept from her by VIPD and the People for motives of bad faith.

¶43     In the instant case, Phipps testified that he sought the surveillance video, but "[a]fter determining the area where the vehicle of Miss Stuart was park[ed] in the parking lot, I was made aware that the camera, the field of depth was not that that it could have focused that far into the

---

[82] *Id.* at 184.

[83] *Id.* at 188.

[84] *Id.*

parking lot where they had no light."[85] He further testified that "[t]he cameras would not have been able to pick up anything clear; it would have been a black image" because Stuart's car "was definitely too far and out of the range of the camera . . . . It was a dark parking area. The vehicle was parked away from the hotel."[86]

¶44    This Court has considered on several occasions whether and when the absence of video or surveillance footage may constitute a valid Due Process claim because of governmental bad faith. In *People v. Yhan*,[87] this Court concluded that VIPD officers who had actually retrieved surveillance tapes but then subsequently lost them did not act in bad faith because "the lost video appears to lack exculpatory value, and because there is no evidence the police believed the video was exculpatory at the time the discs were lost" and thus the Court concluded that it "cannot find that the video was 'constitutionally material to the defense.'"[88]

¶45    In *Smith*, a defendant requested video surveillance evidence fifty-seven (57) days after his arrest and a VIPD officer could not find any as "the system only holds data for 15 to 20 days before it is written over."[89] This Court found that "there is no evidence that the People knew of the video's alleged exculpatory value at the time it was lost or destroyed."[90] Further, this Court concluded that "[b]ecause the lost video may not have been exculpatory, and because there is no evidence that the People believed the video was exculpatory at the time the video was lost, the Court cannot find that the video was 'constitutionally material to the defense'" and that regardless of any exculpatory value "the evidence presented painted only a picture of negligent conduct and not malicious intent."[91]

¶46    In *Sealey*, VIPD recovered video of the area near where a crime occurred from a nearby bed-and-breakfast.[92] The defendant claimed it was exculpatory and would show that he was playing cards with other individuals and was not at the scene.[93] VIPD did not produce the video during initial discovery demands or during a subsequent request for the bed-and-breakfast video and the People later told this Court during a hearing that it had been destroyed.[94] This Court found that "there is insufficient information to conclude that the lost video was exculpatory" as "Defendant has not presented this Court with any information about what exactly the video would have shown (e.g. the area and the time periods reflected in the lost video)."[95] Further, the Court reasoned that the defendant did not provide "any evidence that the People believed the video was exculpatory at the time the video was lost" or "that the People even reviewed the video before it

---

[85] Trial Tr. II; 129, ll. 1-7 (Aug. 4, 2022 Testimony of Delbert Phipps).

[86] Trial Tr. II; 131, ll. 18-20, 24-25; 132 ll. 1-3 (Aug. 4, 2022 Testimony of Delbert Phipps).

[87] No. SX-2008-CR-00402, No. SX-2008-CR-00403, 2010 V.I. LEXIS 55, at *1 (V.I. Super. Ct. Aug. 6, 2010).

[88] *Id.* at *11.

[89] *Smith*, 2011 V.I. LEXIS 20, at *3.

[90] *Id.* at *5.

[91] *Id.* at *6.

[92] *Sealey*, 2014 V.I. LEXIS 75, at *1.

[93] *Id.*

[94] *Id.* at *2.

[95] *Id.* at *5.

*People of the Virgin Islands v. Viviane Stuart a/k/a Viviane Ais*
Case No. ST-2019-CR-00217
Memorandum Opinion and Order
Page 15 of 17

2022 VI Super 93U

was lost."[96] Lastly, this Court reasoned that it could not find that VIPD destroyed the video in bad faith as the "record lacks any direct evidence affirmatively establishing that V.I.P.D. ever took possession of the video recording from the owners of [the bed-and-breakfast]."[97]

¶47     Stuart argues that the surveillance tapes from the hotel she worked at should have been seized in 2005, reviewed, and looked at for exculpatory information and that Toussaint's new revelations contradicts Phipps' investigations. It is not known whether the footage would have contained inculpatory or exculpatory information. However, assuming *arguendo* that Toussaint did see what Stuart says she did, the Court does not discern how the alleged video would then be exculpatory. Stuart states that Toussaint's statement shows that "[w]e now have learned that the camera picked up vehicle movement" and that the video "would have shown what time she arrived, her activities of that evening, and what time she left."[98]

¶48     Yet the statement Stuart is relying on for the basis that the video would have shown her coming and going is that Stuart was seen on video leaving at 2:00 a.m. The People argued, through evidence and testimony, that Stuart's driving around the night of the murder was unusual and suggested she was driving her Co-Defendant, Cajuste. If there was video showing Stuart not just arriving late but leaving in the middle of her shift the night of the murder and then returning, the evidence against her would be stronger, not weaker. In essence, Stuart wants the Court to both believe and disbelieve Toussaint's alleged statement to the People before trial that she saw Stuart leave in her car on the surveillance video: Stuart wants the Court to believe it for purposes of finding bad faith against the People, but to disbelieve its inculpatory conclusions.

¶49     Thus, there is no evidence that the video was exculpatory, some evidence it is neither exculpatory or inculpatory (Phipps' testimony that the video would not have shown anything), and some indication it was inculpatory (Toussaint's alleged statement she saw Stuart leave in the middle of her shift on camera), and there is absolutely no evidence that VIPD believed the video was exculpatory at the time it made inquiries into it and no evidence VIPD then intentionally destroyed or failed to maintain these videos. In fact, there is evidence that VIPD thought the videos had no evidentiary value and thus did not review them at all. At worst, Phipps' failure to seize and review the footage was negligence, but it is certainly not bad faith.

¶50     Likewise, there is no evidence VIPD ever reviewed gas station footage, so they could not have found it to be exculpatory and then deleted it in bad faith as they did not ever see it—so any Due Process claims related to potential gas station surveillance videos must also fail. As in *Yahn, Smith,* and *Sealey,* because there is no evidence that the People knew the videos were exculpatory prior to their deletion (and, notably, evidence that some video may in fact be inculpatory), the Court cannot find that the alleged surveillance videos were constitutionally material to Stuart's defense and VIPD's failure to review and preserve them does not constitute a violation of Due

---

[96] *Id.*

[97] *Id.* at *6.

[98] Def.'s Mot. 16-17.

*People of the Virgin Islands v. Viviane Stuart a/k/a Viviane Ais*
Case No. ST-2019-CR-00217
Memorandum Opinion and Order
Page 16 of 17

2022 VI Super 93U

Process. Stuart's request for a new trial on account of an alleged Due Process violation fails and will be denied.

## IV.   CONCLUSION

¶51    Mr. Egbert "Manno" Stuart was found murdered in his apartment June 22, 2005. On September 13, 2019, Egbert Stuart's wife, Defendant Stuart, was arrested for his murder. Stuart was tried before a jury, beginning August 1, 2022, and ending on August 11, 2022, with the jury finding Stuart guilty of First Degree Murder – Aiding and Abetting. During trial, various witnesses testified against Stuart, including a downstairs neighbor who heard a struggle at some point in the night, a coworker who recalled Stuart's Codefendant, Cajuste, phoning her twice the night of the murder, a forensic expert who based some of his analysis on the observations of responding VIPD officers, and a detective who did not review surveillance tapes after determining with an employee the tapes would be too dark to be useful.

¶52    Stuart challenges her conviction on the grounds that the witnesses were not credible, and the evidence was insufficient. The Court does not assess the credibility of witnesses or weigh the strength of evidence, but rather views the evidence in a light most favorable to the People and determines whether the totality of evidence relating to an element of the crime is sufficient for a reasonable factfinder to infer guilt beyond a reasonable doubt. Here, the Court determines that the totality of all the evidence presented by the People was sufficient for a reasonable juror to find that Stuart associated herself with the plan to murder her husband, that she participated in it as something she wished to bring about, and that she sought by words or action to make it succeed.

¶53    Alternatively, Stuart requests a new trial on alleged prosecutorial misconduct, based on how the People characterized Stuart's relationship with her codefendant at closing. She further alleges the People improperly vouched for the credibility of a witness, and VIPD violated her Due Process rights by failing to keep an alleged exculpatory video. The Court finds that the People's one time characterization of Cajuste as Stuart's "boyfriend," as well as the questions and argumentation regarding the credibility of the witness Ms. Toussaint, were not improper or so prejudicial as to warrant a new trial. Further, the Court determines that VIPD's failure to review certain surveillance tapes is not a Due Process violation that would warrant a new trial as there was no evidence provided as to their exculpatory value or that VIPD was aware of any exculpatory value prior to their being lost, damaged, or destroyed.

¶54    Accordingly, it is hereby

**ORDERED** that Defendant Viviane Stuart's Motion For Judgment Not Withstanding The Verdict Or In The Alternative Motion For New Trial, filed August 31, 2022, is **DENIED**; and it is further

*People of the Virgin Islands v. Viviane Stuart a/k/a Viviane Ais*
Case No. ST-2019-CR-00217
**Memorandum Opinion and Order**
**Page 17 of 17**

2022 VI Super 93U

**ORDERED** that a copy of this Order shall be directed to Attorney Adam G. Christian, Assistant Attorney General Kimberley Riley and Attorney Julie Smith Todman, Territorial Public Defender.

DATED: November 18 , 2022

**DENISE M. FRANCOIS**
Judge of the Superior Court of the Virgin Islands

**ATTEST:**

**TAMARA CHARLES**
Clerk of the Court

BY: _____
**LATOYA CAMACHO**
Court Clerk Supervisor 11/18/2022